IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

———————————

**STATE OF ARIZONA,**
*Appellee,*

*v.*

**JAMES CLAYTON JOHNSON,**
*Appellant.*

———————————

No. CR-16-0261-AP
Filed August 23, 2019

———————————

Appeal from the Superior Court in Maricopa County
The Honorable M. Scott McCoy, Judge
No. CR2010-048824-001
**AFFIRMED**

———————————

COUNSEL:

Mark Brnovich, Arizona Attorney General, O.H. Skinner, Solicitor General, Lacey Stover Gard, Chief Counsel, Capital Litigation Section, Tucson, Jeffrey L. Sparks (argued), Ginger Jarvis, Assistant Attorneys General, Phoenix, Attorneys for State of Arizona

James J. Haas, Maricopa County Public Defender, Mikel Steinfeld (argued), Rena P. Glitsos, Kevin Heade, Deputy Public Defenders, Law Office of the Public Defender, Phoenix, Attorneys for James Clayton Johnson

———————————

CHIEF JUSTICE BRUTINEL authored the opinion of the Court, in which VICE CHIEF JUSTICE TIMMER and JUSTICES BOLICK, GOULD, LOPEZ, BALES (RETIRED), and JUDGE MCMURDIE\* joined.

———————————

\* Pursuant to article 6, section 3 of the Arizona Constitution, the Honorable Paul J. McMurdie, Judge of the Arizona Court of Appeals, Division One, was designated to sit in this matter.

CHIEF JUSTICE BRUTINEL, opinion of the Court:

¶1        This automatic appeal arises from James Clayton Johnson's convictions and death sentence for the murder of Xiaohung Fu. We have jurisdiction under article 6, section 5(3) of the Arizona Constitution and A.R.S. §§ 13-4031 and 13-4033(A)(1).

¶2        In December 2010, Johnson entered Taiwan Massage. Inside, he encountered its owner, Fu. A struggle ensued, in which Johnson bound and repeatedly stabbed Fu, killing her.

¶3        Next door, Marvin Pearce and Terry Weathers heard the commotion. Weathers rushed to check on Fu. When he entered Taiwan Massage, he found the front entrance in disarray. Weathers shouted "hello" but got no response. After a moment, Johnson exited the bathroom at the end of the hall, drying his hands. Weathers asked where Fu was, and Johnson replied she had cut herself and left in an ambulance. Weathers then rushed next door to tell Pearce what he witnessed and called for help. Weathers and Pearce then watched as Johnson got into his truck and sped away. When officers arrived on the scene, they found Fu dead. Fu had been stabbed several times, including one laceration down her back that penetrated through her lung and a near four-inch cut into her neck. She also suffered superficial cuts across her stomach.

¶4        Johnson fled to his girlfriend's apartment where he washed his clothes and truck. Three days later, Johnson robbed a Christmas tree lot and was arrested. (Johnson pleaded guilty to armed robbery on December 21, 2010.) Based on similarities between the two crimes, police linked Johnson to the Taiwan Massage killing. Cell phone tower data and DNA evidence substantiated Johnson's involvement. The State charged Johnson with one count each of first degree murder, kidnapping, and burglary in the first degree.

¶5        The State noticed its intent to seek the death penalty, alleging the following aggravating circumstances: (1) Johnson was previously convicted of a serious offense, A.R.S. § 13-751(F)(2); (2) Johnson committed the offense for pecuniary gain, § 13-751(F)(5); (3) Johnson committed the offense in an especially heinous, cruel, or depraved manner, § 13-751(F)(6); and (4) Johnson committed the offense while on release, § 13-751(F)(7)(a), and while on probation for a felony, § 13-751(F)(7)(b).

**¶6** After trial, the jury found Johnson guilty on all counts and found that the State had proved the (F)(2), (F)(6), and (F)(7)(a) and (b) aggravating factors beyond a reasonable doubt. After considering mitigation evidence, the jury found that Johnson's proffered mitigation was not sufficiently substantial to call for leniency and sentenced Johnson to death.

## DISCUSSION

### A. The A.R.S. § 13-751 Sentencing Scheme

**¶7** Johnson argues that Arizona has not complied with its constitutional obligation to legislatively narrow the class of first degree murders that are eligible for the death penalty. We review Johnson's constitutional challenge de novo. *See State v. Smith*, 215 Ariz. 221, 228 ¶ 20 (2007).

**¶8** In 2013, Johnson joined in litigation challenging Arizona's death penalty for failing to sufficiently narrow the class of first degree murders eligible for a capital sentence. As part of the challenge, the defendants requested but were denied an evidentiary hearing. The trial court denied the defendants' consolidated challenge to the constitutionality of Arizona's death penalty statutes. That litigation eventually led to our decision in *State v. Hidalgo* (*Hidalgo I*), 241 Ariz. 543, 549–52 ¶¶ 14–29 (2017). There, we observed that United States Supreme Court case law undermined the defendants' position, *id.* at 550 ¶ 19, and affirmed the constitutionality of Arizona's sentencing scheme, *id.* at 550–52 ¶¶ 19–29. For the same reasons we expressed in *Hidalgo I*, we reject Johnson's argument here.

**¶9** Johnson next argues the court erred when it failed to hold the requested evidentiary hearing to allow defendants to support their challenge. Johnson further contends that the failure to hold an evidentiary hearing resulted in an incomplete record likely to preclude Supreme Court review. *See Hidalgo v. Arizona* (*Hidalgo II*), 138 S. Ct. 1054, 1057 (2018) (mem.) (Breyer, J., respecting the denial of certiorari). We review the denial of an evidentiary hearing for an abuse of discretion. *See Hidalgo I*, 241 Ariz. at 548 ¶ 7.

**¶10** As we noted in *Hidalgo I*, neither *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004), nor *Mathews v. Eldridge*, 424 U.S. 319 (1976) requires an evidentiary hearing. 241 Ariz. at 548–49 ¶¶ 10–13. And though Johnson

3

points to Justice Breyer's statement respecting the denial of certiorari in *Hidalgo II*, Justice Breyer neither implied that the Constitution requires an evidentiary hearing in that case nor explained why an expanded record would provide a more compelling basis for granting review than the explicit finding that the defendant's factual claims were true. *See Hidalgo II*, 138 S. Ct. at 1057 (stating that the "opportunity to develop the record through an evidentiary hearing was denied" and, "[a]s a result," the record was undeveloped).

¶11        Further, though Johnson argues that denying remand and an evidentiary hearing will condemn a future petition for writ of certiorari to the United States Supreme Court to the same fate as Hidalgo's, he can include the deprivation of the hearing as a basis for review where Hidalgo chose not to. And to the extent Johnson argues that Hidalgo was unable to adequately present the issue to the Supreme Court, his argument ignores that Hidalgo was allowed to supplement the record on appeal with an expanded study of first degree murder cases in Arizona, which found that one or more aggravating circumstances were present in 856 of 866 murders. *See Hidalgo I*, 241 Ariz. at 549 ¶ 17. The trial court's denial of the evidentiary hearing was not an abuse of discretion. *See id.* ¶ 13.

¶12        Separately, Johnson claims the trial court's rulings violated his right to effective assistance of counsel because his counsel's ability to challenge the death penalty was impeded by the denial of the hearing. *See Strickland v. Washington*, 466 U.S. 668, 686 (1984) (providing that the right to counsel includes the right to effective assistance of counsel). But counsel is not ineffective where he requested, and the court denied, the exact hearing Johnson complains was required.

¶13        Lastly, Johnson argues that *Hidalgo I* did not address whether Arizona's constitution provides broader protections or requires an evidentiary hearing. But Johnson fails to develop the argument or offer any legal support as to why the Arizona Constitution would mandate a different result than that required by the Constitution of the United States. We thus decline to consider it. *See State v. Bolton*, 182 Ariz. 290, 298 (1995) (stating that an argument not sufficiently developed on appeal is waived).

## B. The A.R.S. § 13-751(F)(6) Aggravator

### i. Unconstitutionality of the (F)(6) aggravator

¶14        Johnson argues that the (F)(6) especially cruel, heinous, or depraved aggravator is unconstitutionally vague and that the narrowing instructions were inaccurate and insufficient.  We review de novo both the constitutional challenge, *see Hidalgo I*, 241 Ariz. at 548 ¶ 7, and whether the jury instructions correctly stated the law, *see State v. Burbey*, 243 Ariz. 145, 146 ¶ 5 (2017).

¶15        During the trial, the court instructed the jury as follows:

> Definition of especially heinous, cruel, or depraved.  Concerning this aggravating circumstance, all first degree murders are to some extent heinous, cruel, or depraved.  However, this aggravating circumstance cannot be found to exist unless the State has proved beyond a reasonable doubt that the murder was especially cruel, especially heinous, or especially depraved.
>
> "Especially" means unusually great or significant.  The terms "especially cruel," or "especially heinous or depraved" are considered separately.  Therefore the presence of any one circumstance is sufficient to establish this aggravating circumstance.    However, to find that this aggravating circumstance is proven, you must find that the [sic] especially cruel has been proven unanimously beyond a reasonable doubt or that . . . especially heinous or depraved has been proven unanimously beyond a reasonable doubt.
>
> "Especially cruel."  The term "cruel" focuses on the victim's pain and suffering.  If you find the murder was committed in an especially cruel manner, you must find that the victim consciously suffered physical or mental pain, distress, or anguish prior to death.  The defendant must know or should have known that the victim would suffer.
>
> "Especially heinous or depraved."   The term "especially heinous or depraved" focuses . . . upon the defendant's state

of mind at the time of the offense as reflected by the defendant's words and acts. A murder is especially heinous if it is hatefully or shockingly evil. In other words, grossly bad. A murder is especially depraved if it is marked by de[b]a[s]ement, corruption, perversion, or deterioration.

¶16        The court then instructed on the *State v. Gretzler* factors of gratuitous violence, helplessness, and senselessness, stating:

To determine whether a murder was especially heinous or depraved, you must find that the State proved beyond a reasonable doubt that the defendant exhibited such a mental state at the time of killing by inflicting gratuitous violence on the victim beyond that necessary to kill. To find that the defendant inflicted gratuitous violence you must find the defendant intentionally inflicted violence clearly beyond what was necessary to kill the victim and that the defendant continued to inflict this violence after the defendant knew or should have known that the defendant had inflicted a fatal injury.

To assist you in determining whether the murder is heinous or depraved, you may consider the helplessness of the victim and the senselessness of the murder. Helplessness means that the victim is unable to resist. All murders are senseless because of their brutality and finality, yet not all are senseless as the term is used to distinguish those first degree murders that warrant a death sentence from those that do not. Rather a senseless murder is one that is unnecessary to achieve the defendant's objective.

A finding of helplessness and/or senseless[ness] alone or together is not sufficient to prove that a first degree murder was heinous or depraved. A first degree murder is not heinous or depraved unless you also unanimously find that the defendant inflicted gratuitous violence on the victim beyond that necessary to kill.

*See* 135 Ariz. 42, 51–53 (1983).

6

¶17            First, Johnson argues that the (F)(6) "especially cruel" aggravator violates the Eighth and Fourteenth Amendments to the United States Constitution because it does not adequately limit the jury's discretion when deciding whether to impose the death penalty. *See Walton v. Arizona*, 497 U.S. 639, 652–53 (1990), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002).  We have repeatedly rejected this argument in light of further narrowing instructions, as were provided here. *See, e.g., State v. Champagne*, No. CR-17-0425-AP, 2019 WL 3676317, at *15 ¶¶ 75–76 (Ariz. Aug. 7, 2019).

¶18            Johnson next argues the trial court's narrowing instructions failed to provide sufficient guidance on whether Johnson's murder exceeded the norm of first degree murders.  But again, we have repeatedly upheld jury instructions like those given here. *See, e.g., State v. Chappell*, 225 Ariz. 229, 237 ¶ 27 & n.6 (2010).

¶19            Nevertheless, Johnson argues that while the *Walton* Court affirmed Arizona's capital sentencing scheme on the basis that the court—familiar with comparable first degree murder cases—determined whether the crime was "especially heinous, cruel or depraved," 497 U.S. at 652–56, the jury has no such contextual knowledge, and thus *Walton*'s justification no longer applies.  Johnson further argues, citing *State v. Mata* (*Mata II*), 185 Ariz. 319, 324 (1996), that it is impossible to craft a formulaic set of narrowing instructions that can sufficiently guide the jury without comparative review.  But we have previously rejected such challenges when the court provides further narrowing instructions based on *Gretzler* and *State v. Knapp*, 114 Ariz. 531, 543 (1977) (providing narrowing definitions for "heinous," "cruel," and "depraved"), *see State v. (Ruben M.) Johnson*, 212 Ariz. 425, 431–32 ¶¶ 19–22 (2006) (approving narrowing instructions and disavowing comparative review), and Johnson provides no persuasive reason for us to revisit those decisions here. *See also Smith v. Ryan*, 823 F.3d 1270, 1293–95 (9th Cir. 2016) (approving the narrowing construction employed in *Gretzler*).

¶20            Lastly, Johnson argues the "gratuitous violence" instruction incorrectly focused the jury's attention on the physical violence rather than Johnson's mental state.  But the instruction specifically required the jury to find that Johnson "exhibited such a mental state" and "intentionally" inflicted gratuitous violence, thereby focusing the jury on Johnson's mental state and intentions at the time he committed the crime. *See State v.*

*Bocharski*, 218 Ariz. 476, 494 ¶ 87 (2008) (requiring the state to "show that the defendant continued to inflict violence *after he knew or should have known that a fatal action had occurred*," because "[a] showing that a defendant continued to inflict violence after he knew or should have known that a fatal action had occurred provides essential evidence of the defendant's intent to inflict gratuitous violence").

**¶21**     The instructions, when viewed as a whole, required that to find the aggravator, the crime must be "unusually great or significant," "especially cruel," or "hatefully or shockingly evil," and therefore correctly informed the jury that the crime must be above and beyond the normal first degree murder.   These instructions sufficiently narrowed the (F)(6) aggravator. *See State v. Prince*, 226 Ariz. 516, 532 ¶ 51 (2011) (upholding jury instructions from vagueness challenge).

### ii.  *Arguing the (F)(6) aggravator during closing*

**¶22**     Johnson next argues the trial court improperly prevented him from arguing during closing that the State failed to meet its burden in showing the murder was committed in an especially cruel, heinous, or depraved manner.  We review the trial court's ruling on the scope of closing argument for an abuse of discretion. *State v. Pandeli*, 215 Ariz. 514, 525 ¶ 30 (2007).

**¶23**     During closing, Johnson reiterated the burden of proof required to prove the murder was "especially" cruel, heinous, or depraved, and rhetorically asked whether his crime was "unusually great or significant" where the jury had "nothing . . . to compare it to."  The State immediately objected.

**¶24**     Counsel is given wide latitude in closing argument to "comment on the evidence and argue all reasonable inferences therefrom." *State v. Zaragoza*, 135 Ariz. 63, 68 (1983).  "Counsel may not, however, comment on matters which were not introduced in evidence" or "call matters to the attention of the jury that the jury could not properly consider." *Id.*  Just as we have denied the consideration of proportional review in jury instructions, *supra* ¶¶ 20–21, we decline to allow closing arguments suggesting comparative review. *See State v. Bible*, 175 Ariz. 549, 602 (1993) (limiting closing argument to the evidence presented at trial); *State v. Greenway*, 170 Ariz. 155, 171 (1991) ("The trial court's consideration

of other similarly situated defendants is inapposite to *this* defendant's 'character or record', and does not show any of the circumstances surrounding *this* defendant's 'offense' that would call for a sentence less than death.").

**¶25** Thus, Johnson could not argue that his crime was not cruel, heinous, or depraved by comparing it to other murders, nor could he argue that the State did not meet its burden by failing to introduce evidence of similarly situated defendants. He was allowed, however, to argue from the evidence that his crime was not especially cruel, heinous, or depraved; and he was free to point to jury instructions and elaborate upon them, based on the evidence in the record, which he did here. *See Prince*, 226 Ariz. at 532 ¶ 51 (allowing defendants to rely on "norm of first-degree murder" instruction and argue it during closing).

### iii. Sufficiency of (F)(6) evidence

**¶26** Last, Johnson argues that there was insufficient evidence to support the (F)(6) aggravator. Although the (F)(6) aggravator is a single aggravating circumstance, it is written in the disjunctive, and thus we will uphold the (F)(6) finding so long as the murder was either especially cruel or especially heinous or depraved. *See State v. Gunches*, 225 Ariz. 22, 25 ¶ 15 (2010). In reviewing Johnson's claim, we "review[] the record to determine whether substantial evidence supports the jury's finding, viewing the facts in the light most favorable to sustaining the jury verdict." *State v. Roque*, 213 Ariz. 193, 218 ¶ 93 (2006). "Substantial evidence is such proof that reasonable persons could accept as adequate and sufficient to support [the finding of the aggravator] beyond a reasonable doubt." *Id.* (internal quotation marks omitted) (citation omitted).

**¶27** After deliberation, the jury unanimously found that the murder was especially cruel, inflicted gratuitous violence beyond that necessary to kill, was senseless, and that the victim was helpless.

**¶28** The finding that the murder was especially cruel is supported by the record. "A murder is especially cruel if the victim consciously experiences physical abuse or mental anguish before death." *Bolton*, 182 Ariz. at 311. In addition to the fatal neck wound, which involved at least two cuts to Fu's neck, Johnson inflicted a deep wound to her jaw, a gash to her ribs, and a long gash down her back that collapsed her lung. *See State*

*v. Boyston*, 231 Ariz. 539, 555 ¶¶ 82–84 (2013) (stating the jury could conclude, based on the number of stab wounds, which included a 3.5-inch deep cut to the pericardium and heart, that the victim suffered physical pain and mental anguish while being stabbed to death and that the defendant knew or should have known that).  Though Johnson argues the evidence did not establish that Fu was alive and conscious, Dr. Keen testified that Fu was likely alive during the attack: The angle of the back wound indicated Fu was standing, the evidence established that there was a struggle, and Fu suffered defensive hand wounds.  *See State v. McCray*, 218 Ariz. 252, 259 ¶¶ 31–33 (2008) (finding consciousness where the expert concluded, based on the nature of the victim's injuries and condition of the apartment, that a struggle probably occurred).

¶29        Johnson next argues the murder was not especially cruel because there was no evidence that he inflicted pain and suffering in a wanton, insensitive, or vindictive manner.  Johnson argues the infliction of pain "in a wanton, insensitive, or vindictive manner" focuses on the defendant's state of mind and that there was no evidence that he committed the crime as revenge or to inflict harm, pain, or with no regard for the victim's pain.  Our caselaw defeats this argument.  In *State v. Stokley*, we stated that "[c]ruelty focuses on the victim."  182 Ariz. 505, 517 (1995) (contrasting that "[h]einousness and depravity" go to the "mental state and attitude" of the defendant "as reflected by his words or actions" (quoting *State v. Brewer*, 170 Ariz. 486, 502 (1992))).  The evidence sufficiently supports the jury's finding of cruelty.

¶30        The evidence also supports a finding that the murder was committed in an especially heinous or depraved manner.  The state may prove the murder was especially heinous or depraved by establishing that the defendant inflicted gratuitous violence.  *Gunches*, 225 Ariz. at 25 ¶ 15.  A murder involves gratuitous violence when the defendant uses violence beyond that necessary to kill.  *See Gretzler*, 135 Ariz. at 52.  To prove gratuitous violence, the state must first show that the defendant did "use violence beyond that necessary to kill."  *Bocharski*, 218 Ariz. at 494 ¶ 85.  Second, the state must show "the defendant continued to inflict violence after he knew or should have known that a fatal action had occurred."  *Id.* ¶ 87 (emphasis removed).  In addition to the multiple stab wounds, Johnson carved on the victim's stomach.  Based on the blood loss, Dr. Keen confirmed that the stomach carving likely occurred after the victim suffered the fatal neck wound, which itself likely required multiple cuts and

penetrated four inches into Fu's neck. Even if Johnson did not know that the neck wound was fatal, he should have.

**¶31** Johnson argues that the instructions blurred the line between mutilation and gratuitous violence. Even if true, the manner of the murder and the stomach carving reflected mutilation. *See State v. Vickers*, 129 Ariz. 506, 515 (1981) (upholding the finding of depravity where the defendant carved "Bonzai" on the victim's back after killing him). Either Fu was alive when Johnson carved into her stomach, establishing gratuitous violence, or she was already dead, resulting in mutilation. *See State v. Bearup*, 221 Ariz. 163, 173 ¶¶ 50–53 (2009) (upholding the finding of heinous or depraved where the defendant cut off the victim's finger after beating the victim with an aluminum bat, reasoning that the removal of the finger constituted either gratuitous violence or mutilation).

**¶32** Johnson does not challenge the jury's finding that the murder was senseless and the victim helpless, but the evidence nonetheless supports those conclusions.[1] The evidence established that Fu was bound, and therefore helpless, and that her restraints prevented her from interfering with Johnson's attempt to rob her or flee, indicating the murder was senseless. *See State v. Ross*, 180 Ariz. 598, 605 (1994) ("A murder is senseless when it is unnecessary to allow the defendant to complete his objective.").

### C. The *Lynch v. Arizona* "Ineligible for Parole" Instruction

**¶33** Johnson argues the court erred by initially failing to instruct the jury that he was ineligible for parole. Johnson further argues that, following the United States Supreme Court's decision in *Lynch v. Arizona* (*Lynch II*), 136 S. Ct. 1818 (2016), the trial court erred by failing to declare a mistrial. We review jury instructions de novo "as a whole to ensure that the jury receives the information it needs to arrive at a legally correct decision." *Prince*, 226 Ariz. at 536 ¶ 77 (quoting *State ex rel. Thomas v. Granville*, 211 Ariz. 468, 471 ¶ 8 (2005)). We review a trial court's decision whether to grant a mistrial for an abuse of discretion. *State v. Leteve*, 237 Ariz. 516, 526 ¶ 33 (2015).

---

[1] Arizona law requires that we review the sentencing portion, including finding the aggravating factors, for reasonable evidence. *See infra* ¶¶ 192–93.

¶34          Before trial, Johnson requested a jury instruction that he was ineligible for parole, in accordance with *Simmons v. South Carolina*, 512 U.S. 154 (1994). Under *Simmons*, when future dangerousness is placed at issue, the defendant has the right to a jury instruction that he is ineligible for parole if the only alternative to a death sentence is natural life. *Id.* at 162, 168–69. Relying on our decision in *State v. Lynch* (*Lynch I*), 238 Ariz. 84, 103 ¶ 65 (2015), the trial court granted Johnson's request to instruct the jury that parole was not currently available but declined his request to inform the jury that he was never eligible for parole since § 13-751(A) authorized release in the form of executive clemency. The court then instructed the jury that, among the sentences imposable if it found Johnson guilty, was "a life sentence with the possibility of parole after serving 25 years imprisonment."

¶35          On the second day of the penalty phase, the United States Supreme Court issued *Lynch II*, reversed our decision in *Lynch I*, and held that the possibility of executive clemency did not justify refusing the parole-ineligible instruction. 136 S. Ct. at 1819–20. Johnson moved for a mistrial. The State responded that future dangerousness was never placed at issue and that a curative instruction could be given regardless. The court denied Johnson's motion.

¶36          After the penalty phase trial, the court instructed the jury as follows:

> Defendant ineligible for parole. A defendant sentenced to life without the possibility of release after [sic] 25 years must serve the entire 25 years before the defendant can apply for release. There is no automatic release after 25 years. Arizona law does not provide for parole. The only form of release for which defendant is eligible is executive clemency.

¶37          The trial court complied with *Lynch II*. It informed the jury that Johnson was ineligible for parole and that the only possibility for release was by executive clemency after he served at least twenty-five years. The jury thus "receive[d] the information it need[ed] to arrive at a legally correct decision." *Prince*, 226 Ariz. at 536 ¶ 77.

¶38          Nevertheless, Johnson argues the post-*Lynch II* instruction could not cure the court's original deficient instruction because the jury

12

repeatedly heard during voir dire that Johnson was eligible for parole and the only way to ensure his right to a fair trial was to declare a mistrial.

**¶39**      But "[d]eclaring a mistrial is an unusual remedy for trial error and should not be resorted to unless justice requires such a result." *State v. White*, 160 Ariz. 24, 33 (1989). The State neither raised nor argued future dangerousness. Johnson does not point to any evidence showing the jury was confused regarding the law, either before or after the curative instruction. And during closing, Johnson argued that the only alternative to a death sentence was life in prison; the State did not argue otherwise.

**¶40**      After the issuance of *Lynch II*, the trial court instructed the jury that Johnson was ineligible for parole and that "release" meant only executive clemency; we presume the jury followed those instructions. *See State v. Dann*, 205 Ariz. 557, 570 ¶ 46 (2003). The court did not abuse its discretion in denying Johnson's motion for mistrial.

## D. The Significant Impairment Instruction

**¶41**      Johnson argues the court's significant impairment instruction reflected the standard established by the guilty except insane ("GEI") instruction and that it, therefore, imposed a higher burden than that required by the § 13-751(G)(1) mitigator. Because Johnson did not object at trial, we review his claim for fundamental error only. *See State v. Velazquez*, 216 Ariz. 300, 309 ¶ 37 (2007). An error is fundamental if it goes to the foundation of the case, takes away from the defendant a right essential to his defense, or is of such magnitude that the defendant could not have possibly received a fair trial. *State v. Escalante*, 245 Ariz. 135, 142 ¶ 21 (2018). To prevail, a defendant must establish both that fundamental error occurred and that it caused him prejudice (though showing the former may establish the latter). *Id.* at 140–41 ¶¶ 13, 16 (stating that "an error of such a magnitude that a defendant could not possibly have received a fair trial is always prejudicial" (internal quotation marks omitted)).

**¶42**      Section 13-751(G)(1) provides mitigation when "[t]he defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired, but not so impaired as to constitute a defense to prosecution." During the trial, Johnson attempted to show that he was under the influence of Xanax

and possibly cocaine at the time of the murder.  The court instructed the jury as follows:

> Significant impairment.  It is a mitigating circumstance that the defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired but not so impaired as to constitute a defense to prosecution.  The defendant has the burden of proving this mitigating circumstance by a preponderance of the evidence.
>
> "Significantly impaired" means that the defendant suffered from mental illness, personality disorder or substance abuse at or near the time of the offense that prevented the defendant from appreciating the wrongfulness of the conduct or conforming his conduct to the requirements of law.[2]

**¶43**        The State concedes that limiting the definition of "significantly impaired" to the defendant being *prevented* from appreciating the wrongfulness of the conduct was error, but argues the error is not prejudicial.  The jury instructions specifically noted that the burden was not so high "as to constitute a defense to prosecution."  And the State did not argue that Johnson was required to prove the impairment *fully* prevented him from knowing the criminal act was wrong, but instead that he was not so high on Xanax that he was unable to appreciate the wrongfulness of his conduct.  Indeed, the State argued that impairment only referred to an "impact [on] his ability to know right from wrong," and it argued that the jury had heard how Johnson acted when he was actually impaired—slurring his speech, being unable to stay awake—but that on the day of the murder nobody described any such impairment.  Instead, the evidence showed that Johnson took affirmative steps to conceal his role in the murder—Johnson falsely claimed that Fu had cut herself, reversed his truck when driving away to prevent his license plate from being seen, and went

---

2  The Revised Arizona Jury Instructions (Criminal) now provide that significant impairment "substantially reduce[s] the defendant's ability to appreciate the wrongfulness of the conduct . . . ."  Rev. Ariz. Jury Instr. (Crim.)  Capital  Case  3.2,  at  620  (4th  ed.  2018), https://www.azbar.org/media/1904900/rajicriminal-4thed2018.pdf.

to his girlfriend's apartment to clean his truck and clothes—indicating that he knew his conduct was wrong.

¶44 Further, the court instructed the jury that it was "not limited to the mitigating circumstances offered by the defendant," but must "also consider any other information that you find is relevant in determining whether to impose a life sentence so long as it relates to an aspect of the defendant's background, character, propensities, history or record or circumstances of the offense." Johnson presented a large mitigation case. He called several mitigation witnesses who testified that he was a student at Columbine during the infamous school shooting, about his history of substance abuse and a personality disorder, his family love and support, his adoption, and other struggles. Similarly, Johnson presented evidence of his behavior while on drugs. Yet, the jury heard and considered Johnson's mitigation and found it lacking when compared to the three aggravating factors and the nature of the murder. Johnson was not prejudiced by the instruction.

### E. Prison Housing Conditions and Johnson's Right to Trial

¶45 Johnson argues the court erred by allowing the State to introduce evidence of prison housing conditions and to comment on his exercise of the right to trial. We review the court's rulings regarding the admissibility of evidence for an abuse of discretion. *State v. Gill*, 242 Ariz. 1, 3 ¶ 7 (2017). "An error of law committed in reaching a discretionary conclusion may, however, constitute an abuse of discretion." *State v. Wall*, 212 Ariz. 1, 3 ¶ 12 (2006).

#### i. Prison housing conditions

¶46 Before trial, Johnson moved to admit his offers to plead guilty as mitigating evidence, per *Busso-Estopellan v. Mroz*, 238 Ariz. 553, 554–55 ¶¶ 5–7 (2015). The State responded that it intended to rebut Johnson's plea offers with evidence that the offers were conditioned on receiving a life sentence and that prisoners serving such sentences have better prison housing conditions than those on death row. While Johnson agreed that the State could rebut his plea offers by showing they were conditioned, he argued that the prison housing evidence was irrelevant because he was unaware of preferable prison housing conditions and the State had no evidence showing he offered to plead guilty to obtain them. The court

granted Johnson's motion to admit his plea offers, but deferred ruling on the scope of the State's rebuttal until trial.

¶47 During trial, Johnson repeated his objection, filing a motion to preclude the evidence. The State countered that it did not "have to prove that this was the defendant's sole motivation," but that "this is a man who's been to [the Department of Corrections] twice" and thus was "aware of classifications and movement systems and numbering." The court denied Johnson's motion.

¶48 At trial, Johnson introduced his conditioned plea offers. In rebuttal, the State presented the testimony of a Department of Corrections administrator, who explained the potential housing differences, based on custody levels, between an inmate serving a life sentence and one serving a death sentence. In her testimony, she described the "privileges" and "incentives" a life sentence inmate can receive as a result of potential lower custody levels.

¶49 At the close of mitigation, Johnson allocuted. He apologized for the murder, stated that he "would have pled guilty to this first-degree murder as early as March of 2012," and asked for leniency.

¶50 In closing, the State argued:

And you never heard once, in the mitigation claim or the defendant standing in front of you, that he only made a conditional offer to plead guilty to the crimes. That condition being you give me the sentence I want and I'll plead guilty.

Nothing stops a defendant from pleading guilty if that's what they choose. But in this case, the defendant would only plead guilty if he could get the least sentence available. Is that truly admitting guilt and accepting responsibility, to demand he get the least sentence available if convicted of this crime? How worthy is that evidence when the defendant slaps a condition on it?

And you heard from [the Department of Correction's administrator] the possible benefits he can get with a natural life sentence, that being within the first five years and on a

review period thereafter, being reduced all the way down from maximum custody, to closed custody, to medium custody, enjoying all of those privileges, freedoms and benefits. In light of that evidence introduced to solely rebut the defendant's claim of an offer of responsibility, of an acceptance of responsibility, how mitigating are those facts when compared to that defendant would only plead guilty if the State gave him what he wanted?

¶51 In *Busso-Estopellan*, we held that the "[a]cceptance of responsibility is a non-statutory mitigating circumstance" and that defendant's plea offer "is relevant because it tends to make his acceptance of responsibility . . . more probable." 238 Ariz. at 554–55 ¶ 67. We further stated that "the court may exercise its discretion to determine how best to admit the evidence," "may avert . . . confusion . . . by instructing the jury that the State was not required to extend a plea offer," and "may permit introduction of part of the offer letter." *Id.* at 555 ¶¶ 10–11.

¶52 Johnson argues that evidence of prison housing conditions is irrelevant. *See, e.g.*, *People v. Quartermain*, 941 P.2d 788, 807 (Cal. 1997) ("[E]vidence of the conditions of confinement that a defendant will experience if sentenced to life imprisonment without parole is irrelevant to the jury's penalty determination because it does not relate to the defendant's character, culpability, or the circumstances of the offense."). The State argues that it was permitted to include evidence of prison housing conditions to rebut Johnson's plea offers by establishing a motivation for pleading guilty other than remorse or acceptance of responsibility. *See People v. Ledesma*, 140 P.3d 657, 724 (Cal. 2006) (finding nothing improper about the prosecutor questioning defense witnesses about the defendant's motive to plead guilty to rebut defendant's claim that he pled guilty to accept responsibility).

¶53 But the State presented no evidence that Johnson was aware of the housing differences or that a difference in housing conditions motivated his plea offer. The State thus failed to prove the antecedent fact necessary to make the evidence relevant and thus admissible.

¶54 And even if the State introduced evidence that Johnson knew of the differences and made his plea offer based on those differences, evidence of prison housing conditions would still likely be inadmissible.

17

The State may rebut the motivation of the plea offers by showing that some motivating factor compelled the plea offer other than remorse or an acceptance of responsibility. *Busso-Estopellan*, 238 Ariz. at 554–55 ¶¶ 5–7, 10–11. But evidence of prison housing conditions is only marginally probative of an alternative motive for the plea offer and is likely outweighed by the potential prejudice from the inference that a defendant would receive enhanced living conditions if not sentenced to death. *See id.* at 554 ¶ 6 (stating that though "the Arizona Rules of Evidence do not apply in the penalty phase, we are 'guided by fundamentally the same considerations'" (quoting *State v. Guarino*, 238 Ariz. 437, 439 ¶ 6 (2015)); *see also Guarino*, 238 Ariz. at 441 ¶ 15 (noting that unduly prejudicial evidence in the penalty phase may be precluded, even where it would otherwise be relevant). The trial court erred in denying Johnson's motion.

**¶55** The State argues the error is nevertheless harmless. *See Escalante*, 245 Ariz. at 144 ¶ 30 (stating that under this standard the state must show "beyond a reasonable doubt that the error did not contribute to or affect the verdict or sentence" (internal quotation marks omitted)). We agree.

**¶56** Johnson did not object to the evidence's prejudicial impact nor does he now argue that the evidence deprived him of due process because it was unduly prejudicial. *Cf. Prince*, 226 Ariz. at 534 ¶ 65 ("[T]he Fourteenth Amendment's Due Process Clause prohibits . . . evidence that 'is so unduly prejudicial that it renders the trial fundamentally unfair.'" (quoting *Payne v. Tennessee,* 501 U.S. 808, 825–26 (1991))). Even so, in cross-examination of the Department of Corrections administrator and closing, Johnson showed the differences in housing conditions were minimal. Further, the State offered evidence of the prison housing conditions for a limited purpose—"to solely rebut the defendant's claim of an offer of responsibility" (which was also motivated by Johnson's desire to escape the death penalty). It did not rely on the evidence of prison housing conditions to argue that death was required because a life sentence would otherwise reward Johnson and the evidence was cumulative to the State's evidence that his plea offer was contingent on his receiving a natural life sentence. Last, the jury found significant aggravation in this case—the (F)(2), (F)(6), and (F)(7)(a) and (b) aggravators. Based on the foregoing, we conclude that even if the erroneously admitted evidence had been excluded, no reasonable jury would have reached a different result. *Cf. State v. Dann*, 206 Ariz. 371, 374 ¶ 14 (2003) (asking whether, after reviewing the evidence, a

reasonable jury would weigh the mitigation evidence differently and thus reach a different result).

*ii. Comment on plea offers and Johnson's allocution*

**¶57** Johnson next argues the court erred by allowing the State to comment during the penalty phase closing that "[n]othing stops a defendant from pleading guilty if that's what they choose. . . . Is [it] truly admitting guilt and accepting responsibility, to demand he get the least sentence available if convicted of this crime?" But the State's comment related to evidence in the record and was proper rebuttal to Johnson's allocution and plea offers. *See Chappell*, 225 Ariz. at 238 ¶ 32 (stating the right to allocution is not absolute and that the state may present appropriate rebuttal); *United States v. Fell* (*Fell II*), 531 F.3d 197, 220–21 (2d Cir. 2008) (finding the prosecutor's comment—"if [the defendant] wanted to plead guilty he could have"—to be a reasonable response to defendant's use of his plea offer and that no Fifth or Sixth Amendment right was violated). And the State's closing did not otherwise comment on or reference Johnson's allocution in a way that penalized him for exercising his right to go to trial. *Cf. United States v. Whitten*, 610 F.3d 168, 195 (2d Cir. 2010) (stating that the defendant's "constitutionally protected decision to go to trial was cited as a reason to sentence him to death, and thus to 'enhance' what would otherwise be a life sentence").

### F. Inconsistent Mercy, Sympathy, and Presumption of Death Instructions

**¶58** Johnson argues the trial court gave internally inconsistent jury instructions regarding mercy, sympathy, and the presumption of death and that the instructions likely caused juror confusion resulting in an unconstitutional sentence. Because Johnson failed to object at trial, we review for fundamental error only. *Velazquez*, 216 Ariz. at 309 ¶ 37.

**¶59** During the trial, the jury was instructed as follows:

Each one of you must decide individually whether any mitigating circumstance exists.

You are not limited to the mitigating circumstances offered by the defendant. You must also consider any other information

that you find is relevant in determining whether to impose a life sentence so long as it relates to an aspect of the defendant's background, character, propensities, history or record or circumstances of the offense.

The defendant bears the burden of proving the existence of any mitigating circumstance that the defendant offers by a preponderance of the evidence . . . .

. . . .

Even if a juror believes that the aggravating and mitigating circumstances are of the same quality or value, that juror is not required to vote for a sentence of death and may instead vote for a sentence of life in prison. A juror may find mitigation and impose a life sentence even if the defendant does not present any mitigation evidence.

. . . .

[E]ach of you must determine whether, in your individual assessment, the mitigation is of such quality or value that it warrants leniency in this case.

The law does not presume what is the appropriate sentence. The defendant does not have the burden of proving that life is the appropriate sentence. The State does not have the burden of proving that death is the appropriate sentence. It is for you as jurors to decide what you individually believe is the appropriate sentence.

In reaching a reasoned, moral judgment about which sentence is justified and appropriate, you must decide how compelling or persuasive the totality of the mitigating factors is when evaluated in connection with the totality of the aggravating factors and the facts and circumstances of the case. This assessment is not a mathematical one, but instead must be made in light of each juror's individual qualitative evaluation of the facts of the case, the severity of the aggravating factors, and the quality of the mitigating factors found by each juror.

> If you unanimously agree there is mitigation sufficiently substantial to call for leniency, then you shall return a verdict of life. If you unanimously agree there is no mitigation, or the mitigation is not sufficiently substantial to call for leniency, then you shall return a verdict of death.
>
> Your decision is not a recommendation. Your decision is binding. . . .

**¶60** Johnson argues the stated instructions were confusing because at separate times they suggested there was a presumption for life, then death. But the above instructions correctly conveyed that Arizona "law does not presume [there] is [an] appropriate sentence." *See State v. Glassel*, 211 Ariz. 33, 52 ¶ 72 (2005) (discussing scheme's constitutionality where it does not create a "presumption of death"). Further, the instructions accurately describe that it is the duty of each juror to decide whether a life or death sentence is appropriate "in light of each juror's individual qualitative evaluation of the facts of the case, the severity of the aggravating factors, and the quality of the mitigating factors found by each juror."

**¶61** Johnson additionally argues the instructions allowed the jury to believe that the responsibility for determining whether a death sentence should be imposed rested elsewhere, i.e., with the state or defense upon meeting their burdens of proof. *See Caldwell v. Mississippi*, 472 U.S. 320, 328–32 (1985) (noting concern that jurors could "delegate" their responsibility to a higher court in review). The instructions, however, reinforced that each juror's decision was his or her own, that the jury's "decision [was] not a recommendation" but was "binding," and that neither Johnson nor the State had a burden to prove that a life or death sentence was appropriate.

**¶62** Johnson next argues the court gave conflicting "mercy" and "sympathy" instructions and that this error prevented the jury from giving a "reasoned moral response" to Johnson's mitigation. We rejected a similar argument in *State v. Carreon*, 210 Ariz. 54, 70–71 ¶¶ 81–87 (2005), and *State v. Kuhs*, 223 Ariz. 376, 386–87 ¶¶ 51–56 (2010), and Johnson provides no reason to revisit those decisions. The instructions did not obfuscate the concepts of mercy or sympathy, nor did they prevent the jury from giving Johnson's mitigation a reasoned moral response. The instructions limited the jury's consideration to the evidence presented as it related to Johnson's

character, record, and the circumstances of the offense. *See California v. Brown*, 479 U.S. 538, 545 (1987) (O'Connor, J., concurring) (stating that "the sentence imposed at the penalty stage should reflect a reasoned *moral* response to the defendant's background, character, and crime rather than mere sympathy or emotion"). No error occurred.

### G. Execution Impact Evidence

**¶63** Johnson argues the trial court erred by excluding execution impact evidence because it was relevant to his character and showed his family's love and support, citing *Woodson v. North Carolina*, 428 U.S. 280, 288, 304 (1976), *State v. Carriger*, 143 Ariz. 142, 162 (1984), and *People v. Ochoa*, 966 P.2d 442, 505–06 (Cal. 1998). But we have previously held execution impact evidence inadmissible. *See State v. Rose*, 231 Ariz. 500, 513–14 ¶¶ 63–65 (2013); *Chappell*, 225 Ariz. at 238 ¶¶ 28–30; *Roque*, 213 Ariz. at 222 ¶¶ 117–20. We decline to revisit those decisions.

**¶64** To the extent Johnson argues that the court prevented him from presenting evidence touching on his character and family support, we note that the court's ruling "[did] not preclude the defendant's family, friends, associates or representatives from expressing support and/or mitigation." The "ruling simply restrict[ed] anyone on behalf of the family from expressing views regarding the impact upon the family should the defendant be executed." *See Rose*, 231 Ariz. at 514 ¶ 65 n.3 ("To the extent Rose argues that his family ties and the love of a defendant's family has been held by this Court to be mitigation, we agree that the existence of family ties is a mitigating factor." (alterations omitted) (citation and internal quotation marks omitted)).

**¶65** To the extent Johnson urges this Court to allow execution impact evidence to counter victim impact evidence, we are not persuaded. Allowing victim impact evidence reflects the view that for a "jury to assess meaningfully the defendant's moral culpability and blameworthiness, it should have before it at the sentencing phase evidence of the specific harm caused by the defendant." *See Payne*, 501 U.S. at 825. Victim impact evidence bears on the "harm imposed[] upon the victims" of the crime, and thus relates to the circumstance of the offense, *id.* at 826–27, whereas execution impact evidence relates only to the impact on the defendant's family, *cf. Chappell*, 225 Ariz. at 238 ¶ 29 (stating that the requirements of the Eighth and Fourteenth Amendments do not limit the trial court's

authority "to exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense" (quoting *Lockett v. Ohio*, 438 U.S. 586, 604 n.12 (1978)). No error occurred.

## H. Limitation of Mitigation Evidence

¶66 Johnson argues the court erred by limiting his presentation of mitigation evidence. We review the trial court's rulings on the admissibility of evidence for an abuse of discretion. *Gill*, 242 Ariz. at 3 ¶ 7.

¶67 Under the Eighth and Fourteenth Amendments, a defendant may present mitigation evidence based on any aspect of his character, record, or the circumstances of the offense. *Chappell*, 225 Ariz. at 238 ¶ 29 (citing *Lockett*, 438 U.S. at 604). Consequently, § 13-751(G) provides that the jury shall consider any factors proffered by the defendant that are relevant in determining whether to impose a sentence less than death. And § 13-751(C) provides that "the defendant may present any information that is relevant to any of the mitigating circumstances included in subsection G . . . regardless of its admissibility under the rules governing admission of evidence at criminal trials." Though the Arizona Rules of Evidence do not apply in the penalty phase of a first degree murder trial, we are nevertheless "guided by fundamentally the same considerations." *Busso-Estopellan*, 238 Ariz. at 554 ¶ 6.

### i. Columbine

¶68 Johnson was a student at Columbine High School at the time of the school shooting. Before trial, the State filed a motion to narrow the scope of Columbine mitigation to evidence "relevant as it relates to defendant's character, prior record or the circumstances of his offense." The State sought to limit, at the time, roughly 23,000 pages of evidence touching on the effect Columbine had not only on Johnson, but on other students and the community generally. As such, the State sought to preclude irrelevant information and limit unduly cumulative evidence. The court agreed. While it allowed Johnson to "tell the story" of the Columbine shooting with approximately three to five witnesses, introduce evidence of Johnson's reactions during and after the shooting, its effects on him, and its effects on the school and town generally, the court precluded testimony from fellow students of Columbine's impact on their lives and on the lives of other individuals, finding it irrelevant.

¶69 The court did not abuse its discretion. Johnson introduced evidence about the Columbine shooting, that he was a freshman at Columbine High School at the time of the shooting, its effects generally on the community, its effects personally on him, and that he was thereafter diagnosed as suffering from post-traumatic stress disorder ("PTSD"). Testimony by other Columbine survivors as to its effects on their lives does not bear specifically on Johnson's character. The trial court correctly noted that such testimony risks confusing the jury, unfair prejudice, and wasting time, and is cumulative to the other, admissible, Columbine-related evidence. The court did not abuse its discretion by excluding this testimony.

### ii. Adopted-child syndrome

¶70 Johnson argues the court incorrectly limited his presentation of adopted-child syndrome evidence. During the trial, Johnson introduced evidence that he was adopted from Korea as an infant and that Dr. Kirschner had diagnosed him with a dissociative disorder called "adopted-child syndrome." But adopted-child syndrome is not officially recognized in any edition of the Diagnostic and Statistical Manual of Mental Disorders ("DSM"). Johnson claims the court prevented him from asking Dr. Kirschner why adopted-child syndrome was not yet recognized.

¶71 Reviewing the record, the court simply prevented Dr. Kirschner from speculating why the diagnosis was not officially recognized in the DSM, a matter outside of the scope of his testimony and the trial. The court did not prevent Johnson from asking whether the DSM was the "be-all-end-all" as it pertains to diagnoses to establish that it was not. Nor did it prevent Johnson from asking Dr. Kirschner to identify the basis for his diagnosis. No abuse of discretion occurred.

### iii. Drug-seeking behavior

¶72 Johnson argues the court erred by preventing him from eliciting testimony during redirect examination that he sought counseling for psychological benefits and not to obtain prescription drugs.

¶73 During cross-examination of Dr. Abrams, the State elicited testimony that in 2008, Johnson "wanted something to help him relax,"

"that he was out of Xanax," and that "[h]e was at the hospital asking for more Xanax." On redirect, Johnson sought to ask whether "there [was] any indication at that point in time [that] Johnson [was] going to the hospital in order to obtain drugs?" The State objected, arguing that it elicited only testimony showing that Johnson minimized his substance abuse issues. *See State v. Hicks*, 133 Ariz. 64, 69 (1982) (limiting redirect examination to the scope of cross-examination). Though the State claimed during its objection that it did not elicit testimony of drug-seeking behavior during its cross-examination of Dr. Abrams, the question implied that the reason for Johnson's hospital visit was to obtain drugs. The court's ruling sustaining the State's objection was therefore arguably error. But because Johnson admitted that the inference was only implied, not directly stated, and because his question was unclear, any error was harmless.

¶74 Further, the record reveals that some of Johnson's redirect questions on this issue were answered before the State's objection and Johnson addressed the alleged drug-seeking behavior by asking the same questions to Dr. DeMarte, who testified later during the trial. To the extent Johnson generally argues that the court improperly limited mitigation evidence regarding drug-seeking behavior, Johnson introduced evidence that he had a genetic predisposition to substance abuse, was an adolescent when he started abusing drugs, and that he had a history of substance abuse, which he tied back to Columbine and his PTSD diagnosis.

### iv. PTSD

¶75 Johnson argues that the court prevented him from fully detailing the effects of his PTSD. However, as discussed above, Johnson presented evidence of his PTSD diagnosis to the jury. To the extent Johnson argues the court improperly limited redirect on PTSD criteria, Johnson's objected-to question related to substance abuse, whereas, as Johnson acknowledged at trial, the portion of the State's cross-examination at issue related only to nightmares. After sustaining the State's objection, the trial court nevertheless allowed Johnson to ask, "Why [are] nightmares important?" to which Dr. Abrams answered that nightmares were "one of the criteria for [PTSD]." The court did not abuse its discretion.

### v. Counseling

¶76 Johnson argues the court limited his ability to discuss

counseling as mitigation evidence. Johnson has waived this argument by not developing it. *See Bolton*, 182 Ariz. at 298. Nevertheless, we note that Johnson introduced evidence that he attended counseling and therapy post-Columbine and sought out counseling when he was having issues with his marriage; he was not prevented from arguing that he fared better and improved with counseling. No error occurred.

### *vi. Antisocial personality disorder*

¶77 Last, Johnson inconsistently argues (1) that the State impermissibly implied that he had an antisocial personality disorder diagnosis the State knew did not exist, and (2) that he should have been allowed to introduce evidence that he had an antisocial personality disorder as mitigating evidence.

¶78 In mitigation, Johnson introduced evidence that he displayed paranoid, avoidant, and alexithymic features and that Dr. Abrams diagnosed him with personality disorder "NOS" ("not otherwise specified"). However, neither Dr. Abrams nor Dr. Kirschner diagnosed him with a specified personality disorder, such as antisocial personality disorder. Nevertheless, Dr. Abrams and Dr. Kirschner discussed Johnson's antisocial tendencies, as well as antisocial and conduct disorders generally, effects of which dated back to Columbine.

¶79 In rebuttal, the State called Dr. DeMarte, who defined antisocial personality disorder as "a personality disorder where an individual has a pervasive pattern of disregarding societal standards and following rules and engaging in society in a productive manner." She further testified that adolescent conduct disorder was indicative of later antisocial personality disorder, and thus a diagnosis of a conduct disorder in youth usually preceded a diagnosis of an antisocial personality disorder in adulthood. Because she found evidence of a conduct disorder lacking, Dr. DeMarte determined there was no antisocial personality disorder, though Johnson displayed antisocial traits. The State then elicited testimony indicating that Johnson withheld instances of antisocial conduct from her which occurred when he was younger, and Dr. DeMarte answered that such adolescent behavior "would support evidence for antisocial personality disorder." Johnson objected, arguing the State was attempting to back-door an antisocial personality disorder diagnosis, and moved for a mistrial. The State responded that it was only seeking to show that Johnson

underreported his adolescent activities. The court denied Johnson's motion, and ordered the State to confirm with Dr. DeMarte that there was no diagnosis, which she did.

¶80 The court did not abuse its discretion. The court sustained Johnson's objection and remedied the improper inference by requiring the State to ask whether there was a diagnosis, to which Dr. DeMarte responded there was not. Nor was there any harm. Johnson introduced evidence of antisocial traits and his personality disorder. And he presented evidence generally describing antisocial personality disorders and conduct disorders. Lastly, he introduced evidence that doctors did not diagnose him with an antisocial personality disorder. The State's cross-examination, challenging Johnson's underreporting to Dr. Abrams, Dr. Kirschner, and Dr. DeMarte, was permissible rebuttal. To the extent Johnson argues evidence of an antisocial personality disorder should have been allowed, he was not prevented from arguing that his personality disorder and antisocial traits were mitigating circumstances, which he did.

¶81 Contrary to Johnson's claims, he presented evidence regarding the Columbine shooting, his PTSD, his history of substance abuse and his biological predisposition, and how his adoption affected him. Each of the court's rulings correctly excluded irrelevant, cumulative evidence, or testimony outside the scope of cross or redirect examination.

## I. Defense Counsel's Attorneys' Notes

¶82 Johnson argues the court erred by ordering the disclosure of his attorneys' notes. We review the legal scope of disclosure under Arizona Rule of Criminal Procedure 15 de novo, while we review the judge's rulings for an abuse of discretion. *Roque*, 213 Ariz. at 205 ¶ 21.

¶83 In his July 2015 notice of mitigation witnesses, Johnson included summaries of witness statements. The State argued the summaries did not comply with Rule 15.2(h) and asked the court to order that Johnson turn over all written witness statements, not just summaries. Johnson responded that the notes were not subject to disclosure because they were investigatory notes of the defense team and reflected counsel's opinions, conclusions, and impressions. Johnson further asserted that counsel's notes of meetings were inaccurate because they did not reflect verbatim statements and instead were "only quick notes of their own

impressions of the statements made by the witnesses," and that a conflict might arise should counsel be called to verify the veracity of any statements. *See Dean v. Superior Court*, 84 Ariz. 104, 110–13 (1958). The court entered an order for Johnson to "disclose as soon as possible . . . any and all witness statements not previously disclosed, with defense team opinions, theories and conclusions redacted." The court further informed Johnson that he could seek in camera review if he believed disclosure of a specific witness statement would violate an ethical obligation.

¶84 Johnson sought special action relief, which was denied. The court of appeals concluded that the order allowed Johnson to redact opinions, theories, and conclusions from the handwritten notes, and stated that "[p]ending the result of an *in camera* review," it was "in no position to rule in the abstract on whether disclosure of any specific witness statement may raise ethical concerns."

¶85 Arizona Rule of Criminal Procedure 15.2(h)(1)(A)(ii) requires disclosure of any written or recorded statement. Rule 15.4 defines a statement to include "a written record or summary of a person's oral communications," but protects "[s]uperseded [n]otes" which are not "statement[s] if they were substantially incorporated into a document or report . . . ." Ariz. R. Crim. P. 15.4(a)(1)(C), (a)(3). Further, Rule 15.4 protects an attorney's work product, providing that a "party is not required to disclose . . . records, . . . reports, or memoranda to the extent they contain the opinions, theories, or conclusions of the prosecutor or defense counsel." *Id.* 15.4(b)(1).

¶86 Rule 15.2(h) statements, however, "do not meet the 'work product' exception to disclosure under Rule 15.4(b)(1), . . . as they are not 'theories, opinions and conclusions' of the parties or their agents." *See State v. Nunez*, 23 Ariz. App. 462, 463 (1975) (citation omitted). "To rule otherwise would make a premium out of [n]ot taking verbatim statements in order to avoid the disclosure required by the rules." *Id.*; *see also Austin v. Alfred*, 163 Ariz. 397, 403 (App. 1990) (stating that it "would be incongruous to allow a party" to use the attorney-client privilege as a strategic tool to "deny access of the opposing party to relevant information").

¶87 Johnson cites *Hickman v. Taylor*, 329 U.S. 495, 508–14 (1947), and *Upjohn Co. v. United States*, 449 U.S. 383, 399–401 (1981), to support his argument, but neither compels a different result. In *Hickman*, the petitioner

sought the disclosure of witness statements, private memoranda, and personal recollections. 329 U.S. at 510. The Court found the petitioner's request to be a simple attempt, "without purported necessity or justification," *id.*, to gather evidence "revealed to him already through the interrogatories or . . . readily available to him direct from the witnesses for the asking," *id.* at 509, "only to help prepare himself to examine witnesses and to make sure that he ha[d] overlooked nothing," *id.* at 513. The Court stated that "[u]nder ordinary conditions, forcing an attorney to repeat or write out all that witnesses have told him and to deliver the account to his adversary gives rise to grave dangers of inaccuracy and untrustworthiness" and that "[n]o legitimate purpose" would be served. *Id.* at 512–13.

¶88 But the Court did not preclude the production of statements in all cases. Instead, it stated that "[w]here relevant and non-privileged facts remain hidden in an attorney's file and where production of those facts is essential to the preparation of one's case, discovery may properly be had." *Id.* at 511. Indeed, "[w]ere production of written statements and documents to be precluded under such circumstances, the liberal ideals of [discovery] would be stripped of much of their meaning." *Id.* at 511–12.

¶89 In *Upjohn*, the Court reiterated that "[f]orcing an attorney to disclose notes and memoranda of witnesses' oral statements is particularly disfavored because it tends to reveal the attorney's mental processes." 449 U.S. at 399; *see also Baker v. Gen. Motors Corp.*, 209 F.3d 1051, 1054 (8th Cir. 2000) (reasoning that attorney notes reveal the attorney's legal conclusions because, when taking notes, attorneys focus on those facts they deem legally relevant). But as in *Hickman*, the *Upjohn* Court explicitly stated that it was not adopting a bright-line rule. 449 U.S. at 401 ("We do not decide the issue at this time.").

¶90 Here, the statements being sought were not protected by any privilege, *see Nunez*, 23 Ariz. App. at 463, nor did the court allow "unfettered scrutiny" of the notes, *cf. State ex rel. Corbin v. Ybarra*, 161 Ariz. 188, 192 (1989). Rather, it properly ordered production by in camera review to allow Johnson to redact any "opinions, theories, or conclusions" that defense notes included, and Johnson does not raise any dispute arising from that process.

¶91 No abuse of discretion occurred. And although Johnson challenges the court's ruling on Fifth, Sixth, Eighth, and Fourteenth

Amendment grounds, as well as on article 2, sections 4, 15, and 24 of the Arizona Constitution, he provides no basis to conclude the trial was unfair or that a due process or right to counsel violation occurred, fails to develop this portion of his argument, and thus waives it. *Bolton*, 182 Ariz. at 298.

### J. Motion to Withdraw from the 2010 Armed Robbery Plea

¶92          Johnson argues the court denied him the presumption of innocence when it refused to allow him to withdraw from his guilty plea in his unrelated armed robbery case. As the State correctly notes, however, this Court is limited to the issues raised in this appeal. *See* Ariz. R. Crim. P. 31.2(b) (stating that the automatic appeal of a death penalty verdict operates "with respect to all judgments entered and sentences imposed *in that case*" (emphasis added)). This Court has no jurisdiction over the armed robbery plea or the court's denial of Johnson's motion to withdraw his plea agreement in that case.

### K. Compelled Releases

¶93          Johnson argues the court erred by ordering him to sign releases for certain records. We review the trial court's discovery rulings for an abuse of discretion, but note that when the court commits an error of law in the process of reaching a discretionary conclusion, it may be regarded as having abused its discretion. *Twin City Fire Ins. Co. v. Burke*, 204 Ariz. 251, 253–54 ¶ 10 (2003).

¶94          Both before and during the trial, the State requested records from BYU-Idaho, Mesa Community College, and Johnson's Colorado presentence report. *See* A.R.S. § 13-752(G) (providing that "the state may present any evidence that is relevant to the determination of whether there is mitigation that is sufficiently substantial to call for leniency" and may present "any evidence regarding the defendant's character, propensities, criminal record or other acts"). After the State encountered difficulty obtaining the records, the court ordered Johnson to sign releases so the State could obtain them. Johnson does not challenge the disclosure of the records, but instead only being compelled to sign the releases.

¶95          Johnson argues the compelled release order was improper, citing *Sherlock v. Fontainebleau*, 229 F.Supp.3d 1277, 1282–83 (S.D. Fla. 2017) (holding that, under the Health Insurance Portability and Accountability

Act of 1996 ("HIPAA"), a party must comply with the disclosure procedures of HIPAA and the court may not compel a party to sign release authorizations). Johnson further argues that a compelled release is not voluntary and that the court's orders cast doubt upon the fairness of the proceedings.

¶96 But in *Sherlock*, the court recognized the "absence of controlling authority" and that courts were split regarding whether the compelled signing of releases was permissible. *See id.* at 1281–82. And its holding was dependent upon, and limited to, Federal Rule of Civil Procedure 34 and the disclosure procedures of HIPAA. *See id.* at 1282–83 (stating that "[u]nder the HIPAA regulations, a health care provider is authorized to produce records in response to a subpoena," which "should be more than sufficient to cause a provider to turn over the responsive medical records").

¶97 Here, the court had the authority to order Johnson to make records available to the State. *See* Ariz. R. Crim. P. 15.2(g)(1) (granting the court the authority to order, upon the state's motion, the disclosure of material or information not already included if the state has substantial need for it, the "State cannot obtain the substantial equivalent by other means without undue hardship," and the disclosure would not violate the defendant's constitutional rights). The State sought relevant records, to which it was entitled, but as it related to BYU-Idaho, claimed its only access to such records was by an Idaho court order or signed authorization; BYU-Idaho would not recognize an Arizona court order. As for Mesa Community College, the State argued that Mesa Community College waits ten days for an opposing side to respond to a court order and that the college failed to respond to the last court order because it did not believe the order was served properly. Similarly, the State informed the court that Colorado required a court order or signed release.

¶98 Given the State's right to the records and the difficulty in otherwise obtaining the records, we find no error.

### L. Voir Dire

¶99 Johnson argues the court prevented him from choosing a constitutionally adequate jury by limiting his ability to question jurors on whether they would be willing to consider mitigation evidence. We review

rulings on voir dire and motions to strike for an abuse of discretion. *Glassel*, 211 Ariz. at 45 ¶ 36.

**¶100** Before trial, the State filed a motion to prohibit Johnson from asking potential jurors their views on specific types of mitigating circumstances. In opposition, Johnson argued the court should allow "case specific" questions regarding whether jurors could impartially vote for life or death in light of certain mitigating circumstances. The court forbade questions "that groom or condition prospective jurors regarding evidence that may be presented at trial," but stated that it might allow appropriate case-specific questions.

**¶101** After voir dire, Johnson filed a motion declining to pass the jury panel, arguing that he had inadequate "time and opportunity" to "vet" the jury panel pursuant to *Morgan v. Illinois*, 504 U.S. 719 (1992). Johnson further argued that he should have been allowed to ask the jurors whether, given the facts of the case as set out in the defendant's proposed juror questionnaire, they would render a verdict of death. The court denied Johnson's motion, finding "its rulings have all been within the [sic] its discretion and consistent with Arizona Supreme Court precedent." We agree.

**¶102** A defendant is entitled to a fair and impartial jury. *Velazquez*, 216 Ariz. at 306 ¶ 18. As such, due process requires that trial courts permit a defendant to inquire whether prospective jurors would always impose the death penalty. *Morgan*, 504 U.S. at 729–33. However, this principle does not permit the defendant to "ask a juror to speculate or precommit on how that juror might vote based on any particular facts," *Smith*, 215 Ariz. at 231 ¶ 42 (internal quotation marks omitted), nor does it allow the defendant to ask questions regarding specific aggravating circumstances or "what types of evidence the [jury] will consider to be mitigating," *State v. Patterson*, 230 Ariz. 270, 273 ¶ 8 (2012) (quoting *Glassel*, 211 Ariz. at 47 ¶ 44).

**¶103** Here, Johnson sought to ask whether, based on the facts of the case, potential jurors would render a death verdict. He further sought to ask, "[w]hat would 'mitigation' mean to you?" He thus tried to ask the case-specific questions our case law generally prohibits.

**¶104** Insofar as Johnson argues he should have been allowed to ask permissible case-specific questions, he ignores that the court granted him

the opportunity to ask such questions when appropriate. *See State v. Garcia*, 224 Ariz. 1, 8–9 ¶¶ 14–16 (2010) (allowing case-specific questions in order to "properly probe[] beyond abstract juror views on capital punishment" so long as they "merely asked [whether] jurors . . . could *consider* the death penalty in circumstances in which it is permitted under Arizona law"). In addition to multiple juror questionnaire questions about predispositions on capital punishment, *see Glassel*, 211 Ariz. at 46 ¶ 38, Johnson asked jurors "whether [they] could imagine a situation where the totality of a defendant's character, including things he's endured or accomplished, could warrant mercy, despite his crimes."

¶105 Separately, Johnson argues that voir dire was inadequate because the court limited the parties to roughly four-and-a-half minutes per juror. Johnson's claim is meritless. First, the jurors completed a 100-question juror questionnaire to help the parties narrow their follow-up questions. Second, the court stated that it was "willing to work with [the parties] if somebody says something that needs more follow-up than anticipated," and would allow "reasonable continuances where appropriate." The court showed overall flexibility by granting additional time when needed. *See State v. Acuna Valenzuela*, 245 Ariz. 197, 208 ¶ 19 (2018). No abuse of discretion occurred. *See State v. Escalante-Orozco*, 241 Ariz. 254, 271 ¶¶ 33–34 (2017) (affirming five-minute-per-juror time limit), *abrogated on other grounds by Escalante*, 245 Ariz. 135.

## M. Motions to Strike Jurors for Cause

¶106 Johnson argues he was precluded from using peremptory strikes on prospective jurors 56, 154, and 294 because he was forced to use them on prospective jurors 9, 31, and 59, whom the court refused to strike for cause. We review the trial court's denial of a motion to strike a juror for an abuse of discretion, giving deference to the trial court, which was in the best position to observe the potential jurors. *Patterson*, 230 Ariz. at 274 ¶ 14.

### i. Non-strike of prospective jurors 9, 31, and 59

¶107 During voir dire, Johnson posed the following question to prospective juror 9:

[L]et's say you're sitting as a juror on a case, and that it's a first-degree murder case, intentional premeditated murder;

that you and 11 other members of that jury found the defendant, beyond a reasonable doubt, guilty of intentional premeditated killing of an innocent victim; that you and the 11 other jurors considered any defenses that might have been offered, whether it was self-defense, defense of others, heat of passion. For you, in that case, would the death penalty be the only reasonable penalty that you would consider?

Johnson asked similar questions to prospective jurors 31 and 59.

**¶108** The State objected, arguing that "[w]hile [Johnson] can ascertain whether going into a penalty phase . . . a juror may be leaning one way or the other, that hypothetical is improper because it does not fully tell the juror—and they can't bait the juror into yes or no, without telling them they have to consider mitigation." The court agreed, finding the question misleading. Nevertheless, the court allowed Johnson to ask the question as a three-part question, with follow-up questions whether the juror could apply the law as it pertained to finding an aggravating circumstance and considering mitigation. Prospective jurors 9 and 31 answered "no," that they could not imagine a situation where the totality of someone's character could warrant mercy in such a scenario, while prospective juror 59 answered that she would lean towards the death penalty. Johnson then moved to strike the three prospective jurors for cause. The court denied Johnson's motion, finding that the hypothetical posed was confusing and misleading, and stated that the core question was whether the jurors could be impartial at the beginning of the penalty phase, which the court believed they could be.

**¶109** "A juror who will automatically vote for the death penalty without considering the presence of mitigating circumstances does not meet th[e] threshold requirement of impartiality." *Velazquez*, 216 Ariz. at 306–07 ¶ 18 (internal quotation marks omitted). But a prospective juror is not precluded from serving on the jury simply because he favors the death penalty. *Id.* at 307 ¶ 19. "[I]f the juror is willing to put aside his opinions and base his decisions solely upon the evidence, he may serve." *Id.* (citation and internal quotation marks omitted).

**¶110** Here, prospective jurors 9, 31, and 59 all stated they would keep an open mind during the trial, could consider mitigation evidence, and would not automatically vote for the death penalty. *See Wainwright v.*

*Witt*, 469 U.S. 412, 423 (1985) (requiring jurors to "conscientiously apply the law and find the facts"). Further, prospective juror 31 answered that she could responsibly and respectfully make a decision based on the facts of the case, but only after she heard the case details and was provided evidence. And prospective juror 59 added that even in the face of absolute guilt, she would find sentencing the defendant to death to be difficult.

**¶111** Though prospective jurors 9 and 31 answered that they could not imagine a situation where the totality of the defendant's character could warrant mercy, they did so only after a misleading hypothetical that presupposed guilt and an aggravating circumstance, omitted mitigation, and risked implying that a death sentence was required. Indeed, prospective juror 59 answered that she would lean towards the death penalty but qualified that her answer was based on Johnson's hypothetical. The court was in the best position to observe the prospective jurors and determine whether they were impaired. *See Patterson*, 230 Ariz. at 274 ¶ 14. And the record does not indicate that prospective jurors 9, 31, or 59 were substantially impaired or unable to perform their duties as jurors in accordance with the instructions and oath such that denying Johnson's motion to strike was an abuse of discretion.

### ii. Failure to strike prospective jurors 56, 154, and 294

**¶112** Johnson next claims the court erred by refusing to strike prospective jurors 56, 154, and 294 for cause. Johnson did not move to strike prospective jurors 56 or 154, however, so we review Johnson's challenge as to them for fundamental error. *See Velazquez*, 216 Ariz. at 309 ¶ 37.

**¶113** Section 21-211(2) and (4), A.R.S., provides that any person who is "interested directly or indirectly in [a] matter" is disqualified from sitting on a jury in that case, as are those who are "biased or prejudiced in favor of or against either of the parties." Further, Arizona Rule of Criminal Procedure 18.4(b) provides that "[o]n motion or on its own, the court must excuse a prospective juror or jurors from service in the case if there is a reasonable ground to believe that the juror or jurors cannot render a fair and impartial verdict." *See also State v. Moore*, 222 Ariz. 1, 10 ¶ 38 (2009) (stating a judge must remove a potential juror if that person's "views may 'prevent or substantially impair the performance of [the juror's] duties'" (alteration in original) (quoting *Witt*, 469 U.S. at 424)). However, a "prospective juror need not be disqualified unless his opinion is

unqualified" or "fixed." *State v. Narten*, 99 Ariz. 116, 122 (1965). And "a juror's assurances of impartiality need not be couched in absolute terms." *State v. Hoskins*, 199 Ariz. 127, 139 ¶ 37 (2000). "If a juror is willing to put aside his opinions and base his decision solely upon the evidence, he may serve." *State v. Martinez*, 196 Ariz. 451, 459 ¶ 28 (2000) (citation omitted).

### a.  Prospective juror 56 (impaneled juror 1)

**¶114**　　　　Johnson claims prospective juror 56 (hereinafter impaneled juror 1) was predisposed in favor of the State and believed the State had "godly authority." But a review of juror 1's responses does not indicate bias. In his questionnaire, juror 1 stated he believed Arizona's criminal laws were generally appropriate and that he "believe[d] that the government has the authority from God to uphold the law and to keep citizens safe." When asked whether he would accept the responsibility of serving on a death sentence jury, juror 1 answered that God gave the authority to the State and it was juror 1's faith in God that allowed him to accept the responsibility.

**¶115**　　　　None of his answers indicated that he believed God favored the State or imposition of the death penalty. Rather, each of his answers provided why he felt the death penalty could be imposed, as he wrote, "if necessary." Indeed, juror 1 stated that he neither opposed nor favored the death penalty, was willing to follow the law as instructed, that "it would be hard to have someone's life in [his] hands, but [he] could be impartial," he would keep an open mind, and that he would not automatically vote for the death penalty without considering the evidence.

### b.  Prospective juror 154 (impaneled juror 8)

**¶116**　　　　Johnson claims prospective juror 154 (hereinafter impaneled juror 8) had a strong, pro-law enforcement bias and was more likely to believe police officers. In his questionnaire, juror 8 disclosed that he had a friend in the Phoenix Police Department and answered that he had favorable experiences with law enforcement because he "work[ed] with law enforcement at [his] church." However, juror 8 answered that he would follow Arizona law requiring him to give no greater or lesser weight to a law enforcement officer's testimony, stated he would keep an open mind, and would follow the law as instructed.

¶117        During follow-up questioning, Johnson asked whether juror 8 would lean towards believing law enforcement based on his relationships. Juror 8 responded, "You know, I'll be honest.  I want to say no that I wouldn't, but I would do my best not to."  When asked again whether his close relationship with law enforcement would prevent him from impartially judging the credibility of law enforcement officers, juror 8 answered "no."  Only when Johnson pushed further, asking "in [juror 8's] heart of hearts" whether it was not a "no" but a "maybe," did juror 8 state that though he would do his best to check his prejudices, he would be lying if he said it was a definite no, and that his close friendship with a "good" officer might cause him to give other officers the benefit of the doubt.

¶118        But juror 8 also stated that he would do his best to check any prejudice or bias, and repeatedly answered that he would follow the instructions and law.  Subsequently, juror 8 stated that he would not believe every word an officer said just because of his or her title but instead would look at what was being said and determine on his own whether it made sense to him.  Taken as a whole, juror 8's answers do not evidence a pro-law enforcement bias or inability on his part to be impartial.  *See State v. Clabourne*, 142 Ariz. 335, 344 (1984) (finding no bias, and thus no error, where, though a juror had acquaintances with members of law enforcement, all jurors stated they would view the evidence fairly).

c.  Prospective juror 294 (impaneled juror 12)

¶119        Johnson argues that prospective juror 294 (hereinafter impaneled juror 12) was biased because she voiced strong feelings regarding victims' rights and had a friend who suffered domestic violence. On her questionnaire, juror 12 revealed that a good friend had been the victim of domestic violence and that her view of the criminal justice system was negatively affected because restraining orders did not seem to work. However, in the very next question, she answered that those views would not impact her ability to be fair and impartial in the case.  And as with jurors 1 and 8, juror 12 responded that she would keep an open mind during each phase of the trial.

¶120        During follow-up, Johnson asked juror 12 to clarify her questionnaire statement that she was "a strong believer in victim's rights." Juror 12 said that while she regularly heard about the rights of the accused, she rarely hears about the possible horror the victim might have gone

through and would be interested in hearing that. When asked whether hearing victim impact testimony would sway her, juror 12 answered that she did not know how it would affect her but stated she "would try very hard to be open minded, and strong and impartial." Upon further questioning by the court, juror 12 answered that she could set aside any feelings and be fair and impartial.

¶121 Jurors 1, 8, and 12 all answered that they could be fair and impartial, and none of their colloquies indicate otherwise. The court did not abuse its discretion in failing to strike them for cause. *See State v. Tison*, 129 Ariz. 526, 533 (1981) ("Without a showing of unqualified partiality of the juror, we will not upset a determination so clearly within the province of the [trial] court.").

### N. Motion to Strike Juror 6

¶122 Johnson argues the court erred by denying his motion to strike impaneled juror 6 for cause. Again, we review the court's denial for an abuse of discretion. *See Lynch I*, 238 Ariz. at 105 ¶ 71.

¶123 During the trial, Johnson moved to disqualify juror 6 because the juror's daughter had been the victim in an unrelated case arising in February 2016, and Johnson argued this would bias juror 6 in favor of the prosecution. Juror 6 said she had only learned of the incident involving her daughter months after completing the juror questionnaire.

¶124 Rule 18.4(b) requires dismissal of "jurors who cannot render a fair and impartial verdict," *Eddington*, 228 Ariz. at 363 ¶ 7, while § 21-211(2), (3), and (4) bar jurors who are interested in the matter or "biased or prejudiced in favor of or against either of the parties." Johnson argues that juror 6's daughter becoming a victim in another case biased juror 6 in favor of the State. We disagree.

¶125 In *Eddington*, we held that "a peace officer currently employed by the law enforcement agency that investigated the case [was] an 'interested person' who [was] disqualified from sitting as a juror," regardless whether he believed he could be impartial. 228 Ariz. at 365 ¶ 18. There, the officer was an "interested person" due to his working relationship with his law enforcement employer, and by extension, the prosecution. Here, no such relationship exists.

¶**126** Even though a juror may have an experience with law enforcement or a victim of a crime, such experience alone is not disqualifying. *See, e.g.*, *Hoskins*, 199 Ariz. at 139 ¶ 40, 141 ¶ 48 (affirming refusal to disqualify juror who had once been the victim of an armed robbery). Upon further questioning, juror 6 answered that she would be fair and impartial, that her daughter's incident had nothing to do with Johnson's case, and that she was "100 percent here." The court found her answers appropriate, candid, and credible, leaving the court confident that she could serve. The law requires nothing more. *See id.* at 141 ¶ 48. No abuse of discretion occurred.

### O. Arizona Rule of Evidence 106

¶**127** Johnson argues the court erred during trial by limiting questioning and giving Arizona Rule of Evidence 106 preclusive effect. We review the trial court's evidentiary rulings for an abuse of discretion but review de novo the court's interpretation of the Arizona Rules of Evidence. *State v. Steinle*, 239 Ariz. 415, 417 ¶ 6 (2016).

¶**128** Rule 106, the rule of completeness, provides that "[i]f a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part—or any other writing or recorded statement—that in fairness ought to be considered at the same time." It is thus "a rule of inclusion rather than exclusion." *Steinle*, 239 Ariz. at 418 ¶ 10. Johnson argues that the court incorrectly relied on Rule 106 to limit Johnson's cross-examination of Ms. Legg—the DNA technician—as well as his examination of mitigation witness Jonathan W.

¶**129** First, the State objected to Johnson's cross-examination of Ms. Legg. Johnson sought to impeach Ms. Legg by introducing evidence of lab errors. Although the court at one point stated the objection was on Rule 106 grounds, the State's objections focused on lack of foundation and relevance: Johnson failed to cite which records he was relying on and attempted to impeach Ms. Legg by introducing evidence of lab errors in unrelated cases. Regardless, the court allowed Johnson to cross-examine Ms. Legg on each of his proffered grounds, so no exclusion of evidence occurred. There was no error.

**¶130** Second, the State objected, citing Rule 106, to Johnson's introduction of an incomplete statement that Johnson's DNA could neither be included nor excluded from the zip ties found binding the victim. During cross-examination of Ms. Legg, Johnson asked whether she had emailed Detective Denning telling him that Johnson was not a match. The State objected and argued that Ms. Legg's full statement was that "[i]t [was] not possible to include or exclude . . . Johnson." The trial court correctly sustained the State's objection. And though Johnson claims error, he received the answer he wanted: that the test was inconclusive, and that Johnson could not definitively be considered a "match."

**¶131** Third, the State objected during Johnson's examination of family friend Jonathan W. Johnson asked Jonathan whether he thought Johnson "was the type of person that is open to growth and change," based on a letter Jonathan had written on Johnson's behalf. The State objected, citing Rule 106, argued that Johnson was picking and choosing words from the letter, and asked that it be allowed to re-cross Jonathan if the court allowed Johnson to continue. The court sustained the State's objection. Rule 106 arguably applied, but the court allowed Johnson to continue asking Jonathan about his opinion, so even if its decision was wrong, no harm resulted.

**¶132** Johnson argues the court improperly gave Rule 106 exclusionary effect, in that he believes the court precluded him from introducing evidence on Rule 106 grounds. Johnson's argument borders on the frivolous: in each instance, the court allowed Johnson to introduce the evidence he sought. No error occurred.

### P. Prosecutorial Misconduct

**¶133** Johnson argues his conviction was tainted by prosecutorial misconduct. We review claims of prosecutorial misconduct by assessing each claim independently. *Acuna Valenzuela*, 245 Ariz. at 216 ¶ 66. If Johnson objected, we review the purported misconduct for harmless error; if he failed to object, we review for fundamental error only. *Id.* "After determining which claims constitute error," we consider whether their cumulative effect resulted in an unfair trial. *Id.* (quoting *State v. Hulsey*, 243 Ariz. 367, 388 ¶ 88 (2018)). "To prevail on a claim of prosecutorial misconduct, a defendant must demonstrate that the prosecutor's misconduct so infected the trial with unfairness as to make the resulting

conviction a denial of due process." *Id.* (quoting *State v. Martinez*, 230 Ariz. 208, 214 ¶ 24 (2012)).

### *i. DNA evidence*

**¶134** During the trial, the State produced evidence that officers found fourteen zip ties left behind at Taiwan Massage in addition to the pair of zip ties found binding the victim. Ms. Legg testified that Johnson's DNA matched DNA left on the fourteen zip ties in at least ten of sixteen allele locations and that his DNA was found at the other allele locations but at insufficient levels to contribute to a result. Ms. Legg testified that the random match probability of the result was one in 600 trillion Caucasians, one in 3.40 quadrillion Southwestern Hispanics, and one in 145 quadrillion African-Americans. While Korean statistics were not used, Ms. Legg testified that the random match probability was generated based on the expected population in a given area—here, Mesa, Arizona—so the inclusion of any Asian statistics would have likely only increased the rarity of a match. As to the zip ties found binding the victim, Ms. Legg testified that Johnson's DNA profile was present at between four and five allele locations, so his DNA could be included, but that there was not enough DNA present at enough allele locations to establish Johnson as a "match."

**¶135** During closing, the State argued that Johnson's DNA was on the zip ties found binding the victim, stating this his "DNA remains [at] up to five locations" and that his "DNA is there." During rebuttal closing, the State further argued, in response to Johnson's defense that his DNA was not on the zip ties, that "[h]is DNA is on those zip ties . . . . He's there between four and five loci. He's just not there enough to call and he's there on the zip ties, not just at 10 locations." Johnson objected that the prosecutor's closing misstated the evidence but was overruled.

**¶136** Johnson argues the State's closing argument was improper because it misstated the strength of the DNA evidence, citing *Duncan v. Commonwealth*, 322 S.W.3d 81, 91–92 (Ky. 2010). But in *Duncan*, the court only concluded the state's argument—that "not excluded" meant "included" and that the defendant's DNA was a "match"—was improper because there was no scientifically valid estimate of the probability that alleles would match. *Id.* Thus, by asking the jury to infer on the basis of the expert's testimony that the defendant was the source of the DNA, "the

prosecutor sought to wring from that testimony a conclusion it could not reasonably yield." *Id.* at 92.

¶137 Here, Johnson's argument borders on frivolous. The evidence showed that Johnson "matched" the DNA found on the fourteen zip ties left at Taiwan Massage and that Johnson's DNA profile was consistent with the zip ties found on the victim at between four and five allele locations. The State did not use the word "match" to link Johnson's DNA to the ties found binding Fu, and its comment that Johnson's DNA "is there" was nothing more than a reasonable argument based on the evidence. Further, because the State itself emphasized during closing that Ms. Legg wrote in an email to Detective Denning that Johnson could neither be included nor excluded, the jury knew the State was arguing a reasonable inference and not mispresenting a determined fact. *Contrast id.* at 91–92. There was no misconduct.

### ii. Withholding evidence

¶138 Johnson argues the State violated its Rule 15 disclosure obligations, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), based on the State's 2012 failure to timely disclose supplemental police reports and a letter purportedly written by Johnson.

¶139 Under *Brady*, the State must disclose all material, exculpatory evidence. 373 U.S. at 87. But though the State's failure to timely disclose the police reports and letter constituted a late disclosure violation, the late disclosure did not result in the suppression of favorable evidence, and thus no *Brady* violation occurred. *See United States v. Walters*, 351 F.3d 159, 169 (5th Cir. 2003) (finding no *Brady* violation where the defendant received evidence four weeks before trial and "had almost a month after the government disclosed" it to investigate the material and "put it to effective use at trial" (internal quotation marks omitted)). The disclosure dispute occurred nearly four years before trial and Johnson admitted that no prejudice resulted.

### iii. Comment on Columbine evidence and Johnson's allocution

¶140 Johnson argues the State misled the jury into believing that the lack of evidence regarding Columbine and Johnson's allocution proved Johnson was neither affected by Columbine nor sorry for his actions, where

the State had successfully precluded such evidence before trial. Johnson further argues the State improperly commented on the invocation of his right to remain silent. Johnson did not object at trial.

¶141 At the close of mitigation, Johnson presented his allocution, stating:

> I'm very sorry for killing Ms. Fu. It was senseless and horrible. You have heard the mitigating factors of my life that my attorneys feel is relevant in bringing me to this point in my life. I would have pled guilty to this first-degree murder as early as March of 2012.

¶142 The State responded, relying on evidence adduced at trial, and argued that "[Johnson] didn't touch on the tremendous harm and suffering and pain. . . . He didn't care at the time he murdered [the victim] after dragging her into the back room, whether she was a mother or that he would absolutely destroy a family. He certainly never told you that. . . . Instead, when he talks about this crime, he asks about a book deal. . . . [H]e laughed when he was talking to Dr. DeMarte, both about the murder and the armed robbery. . . . How much sympathy did the defendant show any of his victims at any time[?]" The State further argued that Johnson "didn't address a single factor in his life" but "told [the jury] that the mitigation [it was] presented . . . [is] what his attorneys believe [is] what brought the defendant to that point in his life," and that, as it related to Columbine, "[n]ever once, ever, other than the mention of [his friend] Steven, did [the jury] ever hear any statement made by the defendant . . . about feeling bad for the murdered classmates, or teachers or the wounded."

¶143 Johnson argues that it is improper for the State to take unfair advantage of the court's evidentiary rulings, citing *People v. Daggett*, 225 Cal. App. 3d 751, 758 (1990). *Daggett* is inapposite. There the trial court erroneously precluded relevant information—that the child molestation victim, who was himself accused in an unrelated case of molesting other children, had been molested by other children in the past—and this error was compounded by the prosecutor's argument during closing that the victim had learned the inappropriate behavior from being molested by the defendant. *Id.* at 754–57.

¶144        Here, the prerequisite error is missing.  The court correctly precluded irrelevant Columbine evidence.  *See supra* ¶¶ 68–69, 81.  And as to his allocution, neither the court nor the State prevented Johnson from allocuting; the State argued that it had the right to rebut Johnson's allocution should he claim remorse.  *See State v. Goudeau*, 239 Ariz. 421, 468 ¶¶ 207–09 (2016).

¶145        As to his claim that the State improperly commented on the invocation of his right to remain silent, the State's comments came in response to his allocution, *see id.* (finding no improper comment on the defendant's Fifth Amendment right where the prosecutor's comments came in response to the defendant's allocution), and were based on evidence in the record, *see State v. Anderson*, 210 Ariz. 327, 350 ¶ 97 (2005) (allowing the prosecutor to comment that evidence was "not particularly relevant" or "entitled to little weight").  The State's Columbine comments followed its argument that although Johnson presented a large portion of evidence regarding the Columbine shooting, no mitigation witness could testify that Johnson expressed remorse for the Columbine victims.  Instead, the State argued, the evidence showed that Johnson felt sympathy for the shooters because they were bullied.  No misconduct occurred.

*iv.  Misstating the law*

¶146        Johnson argues the State misstated the law by arguing that the jurors had to find one mitigating circumstance was alone sufficient to warrant leniency, where mitigation is correctly considered in the aggregate. Johnson bases his argument on a statement in the State's closing:

> What value, what import, what importance, what weight, if any, do you give to a fact you believe was proven?  Does it reduce the defendant's moral culpability, his blameworthiness for the murder?  And, finally, is it sufficiently substantial—is it proven and sufficiently substantial to call for leniency?

¶147        But the entirety of the State's closing argument shows no misconduct occurred.  The State correctly reiterated that the jurors "must decide how compelling or persuasive the totality of the mitigating factors are against the totality of the aggravating factors."  The State's comment was only an argument that, as to each of Johnson's ten proffered mitigating

circumstances, the jurors should evaluate each one to determine whether it was proven by a preponderance of the evidence and whether it truly related to an aspect of Johnson's background, character, propensities, record or circumstance of the offense. The State never argued that the jurors were limited to considering one mitigating factor to the exclusion of others or that Johnson had to prove that any single mitigating factor was sufficiently substantial on its own to warrant leniency.

*v. Shifting the burden of proof*

¶148 Johnson argues the State shifted the burden of proof to Johnson to submit evidence and prove his innocence. During the guilt phase closing argument, the State argued in rebuttal:

> The physical evidence in this case does not have a motive or a reason to lie. And the plain and simple matter is that if what the defense is arguing to you is true there would be evidence to support those claims and there's an overwhelming lack of any evidence that anyone, other than the defendant, committed these crimes. This was a thorough and complete investigation regardless of the attacks you just heard.

Johnson did not object.

¶149 Due process requires the State to prove every element of a charged crime beyond a reasonable doubt. *In re Winship*, 397 U.S. 358, 364 (1970). The State improperly shifts the burden when it implies a duty upon the defendant to prove his innocence or the negation of an element, *see State v. Corona*, 188 Ariz. 85, 91 (App. 1997), and otherwise errs when it comments upon the failure of a defendant to testify or present a defense, *see State v. Still*, 119 Ariz. 549, 551 (1978). However, "[a] comment that certain facts brought out by the prosecution are uncontradicted is not objectionable." *Still*, 119 Ariz. at 551.

¶150 The entirety of the State's rebuttal closing argument was that, while Johnson argued in closing that the State did not prove that he committed the crime, "[Johnson] just did not count on the phone evidence, the DNA evidence, and those cell phone towers we know now he drove by going to the scene, while waiting at the scene, and running away, driving away from the scene." Further, the State did not argue unprompted that

Johnson failed to show someone else committed the murder. During his closing, Johnson argued the investigation was inadequate and inferred that someone else committed the crime even though he never noticed a third-party defense. The State objected. *Cf. State v. Acosta*, 101 Ariz. 127, 129 (1966) ("The general context of the argument surrounding the statements complained of was not to allude to defendant's failure to testify, but rather to bring home the point that the evidence was, at least in the view of counsel for the state, uncontroverted, and justified a verdict of guilt."). No misconduct occurred.

### vi. Impugning the integrity of defense counsel

**¶151**        Johnson argues the State repeatedly impugned the integrity of defense counsel. Johnson fails to develop his argument, however, and so we find it waived. *Bolton*, 182 Ariz. at 298. Regardless, we note that the comments Johnson cites were either made in response to defense theories, mischaracterized in Johnson's briefing, or occurred outside the presence of the jury. *See Acuna Valenzuela*, 245 Ariz. at 220 ¶ 93 ("[R]eferring to defense evidence as 'myth' or 'fanciful' and attacking defense theories [is] permissible, so long as it is directed at defense *theories* rather than defense *counsel*.") (internal quotation marks omitted)).

### vii. Arguing inferences and conclusions during openings

**¶152**        Johnson argues the State improperly argued inferences and conclusions during opening. "Opening statement is counsel's opportunity to tell the jury what evidence they intend to introduce. [It] is not a time to argue the inferences and conclusions that may be drawn from evidence not yet admitted." *Bible*, 175 Ariz. at 602 (citation omitted).

**¶153**        During the guilt phase opening, Johnson claims the State improperly focused on the victim's family's use of an interpreter by stating "their home language . . . is what is comfortable and safe . . . [a]s they listen to these horrific details of the murder." Johnson argues this opening comment was paired with the State's request during closing that the jury remember "how [the family] appeared in front of [them] heartbroken and the difficulties they encountered . . . trying to put into words in a language with letters and symbols we don't understand, with the use of an interpreter[, t]he enormity of this loss, their grief, funneled through the interpreter."

**¶154**         Johnson also argues the State impermissibly implied that the crime included deliberation, a conclusion, during its opening by arguing that Johnson took "the time effort and deliberation" to commit the murder. Again, Johnson timely objected.

**¶155**         As to the first statements, the prosecutor's comments were not improper, but even if they were, any error was harmless.  The jury was repeatedly instructed that the lawyer's arguments were not evidence and the jurors were able to judge for themselves the manner in which the family spoke and the murder's effect on them. *See State v. Newell*, 212 Ariz. 389, 403 ¶ 68 (2006) (stating "[w]e presume that . . . jurors follow[] the court's instructions").

**¶156**         As to the second statement, the prosecutor's comment was a conclusion drawn from the facts and thus improper argument in opening remarks.  But again, the error was harmless.  The jury was instructed that the lawyer's arguments were not evidence. *Id.*  And "[w]hile[] the comment during opening statement was improper at that point, it was a reasonable inference from evidence later introduced and would have been proper during closing argument." *Bible*, 175 Ariz. at 602.

                    *viii.  Vouching*

**¶157**         Johnson argues the State engaged in vouching. "Two general forms of prosecutorial vouching exist: (1) when 'the prosecutor places the prestige of the government behind its witness'; or (2) when 'the prosecutor suggests that information not presented to the jury supports the witness's testimony.'"  *Acuna Valenzuela*, 245 Ariz. at 217 ¶ 75 (quoting *State v. Vincent*, 159 Ariz. 418, 423 (1989)).  "Placing the prestige of the state behind its witness 'involves personal assurances of a witness's veracity,' while '[t]he second type of vouching involves prosecutorial remarks that bolster a witness's credibility by reference to matters outside the record.'" *Acuna Valenzuela*, 245 Ariz. at 217 ¶ 75 (alteration in original) (quoting *State v. King*, 180 Ariz. 268, 277 (1994)).

### a. The prestige of the government

**¶158** Johnson first argues that the State placed the weight of the government behind the witnesses by arguing that the victim's daughter testified with "wisdom beyond her years" and that her husband "stood before you and told you how his family suffered a profound loss" which was "the measure of a man." Johnson did not object.

**¶159** But these statements, taken in the context of closing argument, do not establish vouching. Neither statement placed the weight of the government behind a witness by providing personal assurances of a witness's veracity, *cf. Vincent*, 159 Ariz. at 423 (where the prosecutor argued that "the State wouldn't have put Mr. Calaway on the witness stand if [it] didn't believe every word out of his mouth"), nor did the statements imply that the jury should find them more credible because they were State witnesses, *see Acuna Valenzuela*, 245 Ariz. at 217 ¶ 75 (stating that vouching of this kind "involves personal assurances of a witness's veracity" (quoting *King*, 180 Ariz. at 277)).

**¶160** Johnson also claims the prosecutor improperly vouched by placing the weight of the government behind herself during arguments to the court, by avowing that she "probably touched those pages more times than the defense," by arguing that she was "so detailed" and "so prepared" for her interviews, and by stating her "office's position" on certain issues—"Judge, our office's position is that the . . . State shouldn't be in a position to come up with it just because the State disagrees." But reviewing the record, we do not find that the State's arguments to the court regarding its position on a disputed matter constitute vouching. And further, we note that each cited argument was made outside the presence of the jury.[3]

### b. Facts not in evidence

**¶161** Johnson next argues the State vouched by implying that facts not in evidence supported the State's desired verdict. First, Johnson argues

---

[3] Johnson argues, for the first time in his reply brief, that the State improperly vouched by using "we know" statements. *See Acuna Valenzuela*, 245 Ariz. at 218 ¶ 85. Because Johnson did not raise the issue in his opening brief, we do not consider it. *State v. Cannon*, 148 Ariz. 72, 79 (1985).

the State improperly vouched by implying that the judicial system already dismissed Johnson's claim of innocence:

> You would have to believe this man is the unluckiest man on the face of the planet if you're to buy he was just merely present. You would also have to think the last four weeks of your life were an absolute waste because he just happened to be there. It's not a coincidence. It's not dumb, bad luck. Everything you've heard, everything the state has shown you is evidence of the defendant's guilt.

Johnson did not object.

¶162 The State's comment was based on evidence in the record and did not imply that facts not in evidence supported the State's desired verdict. *Cf. State v. Leon*, 190 Ariz. 159, 161–62 (1997) (where the prosecutor argued that the jury was "not going to have the inside information as to what occurred"). Neither was the State's comment isolated nor unprompted. Rather, the State's comment came in response to Johnson's cross-examination that attempted to portray Johnson as an unlucky, innocent bystander. To the extent the comment that "[y]ou would also have to think the last four weeks of your life were an absolute waste because he just happened to be there" was improper, any error was harmless, as the jury was properly instructed that the law presumed Johnson to be innocent and the jury "must not think that the defendant is guilty just because of a charge."

¶163 Johnson next claims the State improperly vouched by referencing the victim's family's use of an interpreter, as discussed above. *See supra* ¶¶ 153, 155. But just as the comments did not suggest the family was more credible because the State believed them, neither did they bolster the family's credibility by reference to something other than the facts in the record. No misconduct occurred.

### ix. Appealing to fears and sympathy

¶164 Johnson claims the State improperly played to the jury's fears and sympathies. During its guilt phase closing argument, the State argued the following:

These were the last injuries inflicted, completely, totally without a doubt unnecessary.  Completely.  Completely.  Completely unnecessary.  As she was dying, as her heart no longer could beat, as her lungs could no longer fill with air, he's carving into her stomach.

. . . .

If the defendant did nothing wrong or was just simply at the wrong place at the wrong time, why the lies and why the nature that little cutting mocking humor, but then again this is the same man who within an hour of leaving [Fu] tucked away in that back room could eat dinner with [his girlfriend] and spend part of the evening with his parents.

. . . .

The killer is the defendant and he killed with premeditation.  He killed with deliberation.  He killed after thinking about it and he killed after he could have stopped and he killed because he wanted to and then he carved into her body because he wanted to.

Johnson did not object.

¶165        "Attorneys, including prosecutors in criminal cases, are given wide latitude in their closing arguments to the jury."  *State v. Comer*, 165 Ariz. 413, 426 (1990).  Within that wide latitude, the State "may comment on the vicious and inhuman nature of the defendant's acts."  *Id.*  The State may not, however, make arguments which appeal to the passions, fears, or prejudices of the jury.  *Id.* at 426–27.

¶166        The arguments here were not an appeal to fear, as the State made no argument that, in the absence of a guilty verdict, Johnson would pose a future danger.  Instead, the arguments were directed at how terrible the murder was.  To the extent the argument should have been reserved for the aggravation phase of the trial and went to the (F)(6) aggravator, any impropriety in the guilt phase closing was harmless.  The comments did not have the effect of encouraging the jury to convict on a basis other than the evidence and the elements of the offense.  Further, as in *Escalante-Orozco*, the comments were fleeting and unconnected, and the jury was instructed that the lawyer's comments were not evidence and that they

were "not [to] be influenced by sympathy." 241 Ariz. at 282 ¶ 102 (alteration in original). The comments were "not of such magnitude to deprive [Johnson] of a fair trial" during either the guilt phase or the aggravation phase. *Id.* (citation omitted).

*x. Encouraging the jury to use the verdict to send a message*

**¶167** Johnson argues the State improperly encouraged the jury to use its verdict to send a message. During her penalty phase closing argument, the prosecutor argued:

> Someone much smarter than I am gave a quote that a society declares its attitude toward crime by the punishment it exacts. We express how we feel about crime by the punishment we impose.
>
> Another simple, less artful way to say this is that the punishment should fit the crime. And should reflect the horror, the disgust, that all of you must have felt as these days in trial unfolded and you saw the full extent of what this man has been capable—capable of in his life.

**¶168** The prosecutor further argued later in closing that:

> The death penalty is such an expression of moral outrage for crimes that some people choose to commit. Our society has a death penalty because we have a right to express our moral outrage for such behavior, and because you have a right to demand where does personal responsibility fit in? Because the exaggerations, the blame, and the excuses, and the lies are all going to stop now.

Johnson did not object to either comment.

**¶169** But the State did not ask the jury to send a message to the community. *Cf. United States v. Runyon*, 707 F.3d 475, 514–15 (4th Cir. 2013) ("Whereas reminding the jury that it 'express[es] the conscience of the community' nevertheless maintains a proper focus on the defendant (since any 'expression' is directed at the defendant alone), urging it to 'send a message to the community' invites it to play to an audience beyond the

defendant" and "to use its decision . . . to serve some larger social objective," which "is at least in tension with the individualized assessment of the defendant's culpability that the Constitution requires.") (alteration in original; *Sinisterra v. United States*, 600 F.3d 900, 910–11 (8th Cir. 2010) (finding error where the prosecutor linked the defendant's charges to the broader drug problem, told the jury to act as the "conscience of the community," and asked the jury to send a message with its verdict)). The State focused its argument on Johnson and argued that "the punishment should . . . fit the defendant, the criminal, in addition to fitting the crime."

*xi. Improperly seeking to inflame the jury*

¶170 Johnson argues the State committed misconduct by attempting to inflame the jury, by arguing the murder was "grotesque," "brutal," "bizarre," "horrific," and "violent," and by using the following adjectives to describe Johnson's actions: "severely," "terribly," "vicious," and "ceremoniously."

¶171 Johnson claims that during its mitigation phase opening statements, the State further attempted to inflame and taint the jury by arguing that Johnson's mitigation witnesses had "bias," "motive," and maybe even "an agenda."

¶172 Finally, Johnson claims the State, during its closing argument, improperly tarnished the defense and its witnesses by telling the jury:

> The problem with all of the evidence [Johnson] wants and needs you to believe is that a lot of it is simply just not true, was just not proven, or is exaggerated, or is presented in such a way to make you feel responsible that the defendant is now found guilty of first-degree murder with circumstances, those three [aggravators] that you found, that made the defendant eligible for the death penalty.
>
> The bottom line is that the mitigation presented is not sufficiently substantial to justify leniency in this case.

Johnson never objected.

**¶173** The State certainly used strong language during opening statements to describe the murder, but the evidence would later indicate that the murder was violent and brutal. *See State v. Phillips*, 202 Ariz. 427, 437 ¶ 47 (2002) (finding no impropriety in the prosecutor's opening statement that defendant's actions were "terrorizing," that he appeared "outraged, beyond control, and absolutely terrifying," and that the victims were "cowering, hiding, and praying to God Almighty" because those remarks were based on the evidence), *superseded by statute on other grounds as recognized in State v. Carlson*, 237 Ariz. 381 (2015).

**¶174** The State's warning of "bias" and "motive" addressed the credibility of Johnson's witnesses and responded to Johnson's attempt to bolster his mitigation witnesses' credibility. During Johnson's opening, he stated:

> Ladies and gentlemen, you're going to hear from [Johnson's] friends, family, former classmates. We all know they're going to be put in an uncomfortable seat as witnesses . . . . They're not professional witnesses . . . .
>
> . . . .
>
> They're certainly not going to be as polished as some of those other witnesses that you heard . . . .
>
> . . . .
>
> They're going to be subject to cross-examination, too. And like all witnesses, you have to consider their credibility; but again, consider their situation. They're here because they love [Johnson]. . . . Decide their credibility, but these folks are coming from a good place to come and testify for [Johnson], and they didn't do anything wrong.

The State's comments were not improper.

**¶175** Nor were the State's final comments, *supra* ¶ 172, an attempt to appeal to the jurors' emotions by telling them the defense was trying to make them feel guilty about their decisions. Even if the comments could be read to represent an attack on the defense, *see Hulsey*, 243 Ariz. at 390 ¶¶ 98–99, they were minor and couched in the State's argument that the jury was to impose the death penalty if it did not find mitigation sufficiently

substantial to call for leniency. On this record, we cannot say that any of these statements affected the jury's verdict or deprived Johnson of a fair trial, especially in light of the jury instructions that counsel's arguments were not evidence.

### xii. Cumulative effect

**¶176** Johnson argues the State repeatedly used improper arguments to obtain a conviction and death sentence and that the cumulative impact of its misconduct deprived him of due process. *See Acuna Valenzuela*, 245 Ariz. at 223 ¶ 118. But "[c]umulative error requires reversal only when misconduct is 'so pronounced and persistent that it permeate[s] the entire atmosphere of the trial, indicating that the prosecutor intentionally engaged in improper conduct and did so with indifference, if not a specific intent, to prejudice the defendant.'" *Id.* at 224 ¶ 119 (quoting *State v. Payne*, 233 Ariz. 484, 515 ¶ 134 (2013)).

**¶177** Here, the record does not support Johnson's claim. Johnson rarely objected and ignores that several of the purported improper comments occurred outside the presence of the jury during argument to the court. Indeed, the record reveals only a few minor instances of misconduct relating to improper inferences during opening statements. Accordingly, Johnson has failed to show the allegations so infected his trial as to deprive him due process.

### Q. Motion to Change Counsel

**¶178** Johnson argues the court improperly denied his two motions to change counsel. We review the court's denial of a request for new counsel for an abuse of discretion. *State v. Cromwell*, 211 Ariz. 181, 186 ¶ 27 (2005).

**¶179** "A criminal defendant has a Sixth Amendment right to representation by competent counsel." *Id.* ¶ 28; *see also* U.S. Const. amend. VI. "The presence of an irreconcilable conflict or a completely fractured relationship between counsel and the accused ordinarily requires the appointment of new counsel." *Id.* ¶ 29. However, "single allegation[s] of lost confidence," "disagreements over defense strategies," or other conflicts "less than irreconcilable" do not necessarily require the appointment of new counsel. *Id.* Rather, "[t]o constitute a colorable claim, a defendant's

allegations must go beyond personality conflicts or disagreements"; the defendant instead bears the burden to demonstrate "facts sufficient to support a belief that an irreconcilable conflict exists warranting the appointment of new counsel in order to avoid the clear prospect of an unfair trial." *Id.* at 187 ¶ 30.

### i. Johnson's 2015 motion to change counsel

**¶180**　　　In September 2015, Johnson filed a motion to change counsel and asked that "any competent lawyer" be substituted for all future proceedings. Johnson complained that (1) he wanted to see every motion defense counsel had filed on his behalf, but his lawyers had not sent them; (2) he had not seen the most recent "plea proposal" and that his lawyers included information in the proposals over his objection; (3) his lawyers had not filed motions that other capital defendants had filed in their cases; and (4) his lawyers had not given him copies of his mental health reports.

**¶181**　　　Johnson's lawyers explained that they had not sent the mental health records to the prison for confidentiality reasons and that they had not sent a copy of every motion filed because the agency did not have the staff to send him five years' worth of information at the time. His lawyers assured the court that they had filed all appropriate motions on Johnson's behalf and spoke with Johnson "on a regular basis." His lawyers denied that there was an irreconcilable conflict but acknowledged that if Johnson refused to cooperate in the future or insisted on inappropriate trial strategies, then one could develop.

**¶182**　　　The court informed Johnson that it found his lawyers were thorough, prepared, and diligent. The court further praised how consistently prepared Johnson's lawyers were, despite complex issues, and how well they had worked with opposing counsel. The court denied Johnson's motion, advised Johnson that he would be disadvantaged by a change of counsel because his current counsel had firsthand knowledge of all aspects of his case, and recommended that Johnson cooperate with his counsel.

**¶183**　　　Johnson has not met his burden to show that an irreconcilable conflict existed. Johnson's disagreements in his 2015 motion were minor, and his attorneys regularly contacted him. *Cf. State v. Gomez*, 231 Ariz. 219, 224 ¶ 20, 225–26 ¶ 29 (2012) (concluding trial court did not err in denying

motion for change of counsel where defendant alleged that defense counsel had not visited him in more than a year and had not devoted enough time to prepare for the case). And though defense counsel noted there were some frustrations, counsel advised the court that they could continue to work together. The court was in the best position to consider the evidence of a conflict, found it insufficient, and so do we. *See Cromwell*, 211 Ariz. at 187 ¶ 35 (stating that the denial of the motion for change of counsel is discretionary and finding no abuse of discretion).

¶184        Nevertheless, Johnson argues the court erred by failing to consider the *State v. LaGrand* factors. *See* 152 Ariz. 483, 486–87 (1987) (stating that the court should consider "whether new counsel would be confronted with the same conflict; the timing of the motion; inconvenience to witnesses; the time period already elapsed between the alleged offense and trial; the proclivity of the defendant to change counsel; and quality of counsel").

¶185        But "[t]he nature of the inquiry will depend upon the nature of the defendant's request." *State v. Torres*, 208 Ariz. 340, 343 ¶ 8 (2004). And in the grand scheme, the "request for new counsel should be examined with the rights and interest of the defendant in mind tempered by exigencies of judicial economy." *LaGrand*, 152 Ariz. at 486.

¶186        Johnson argues the court erred by focusing on his counsel's competence, citing *Torres*, 208 Ariz. at 344 ¶ 15 (stating that "in most cases, . . .'quality of counsel'" will not be a factor to consider when defendant requests substitution of counsel), but Johnson's complaints regarding the motions his lawyers were filing on his behalf necessarily concern the adequacy of counsel and whether they were properly representing his interests. As the court recognized, nothing in the record indicated they were not.

¶187        As to the other *LaGrand* factors, "although the trial court could have engaged in a more searching exploration" of Johnson's claims and counsel's responses, "the court did not abuse its discretion because it sufficiently inquired into the purported [breakdown.]" *State v. Champagne*, No. CR 17-0425, 2019 WL 3676317, at *3 ¶ 13 (Ariz. Aug. 7, 2019) (alteration omitted) (citation and internal quotation marks omitted). The court sought out counsel's responses to Johnson's claim of a breakdown and found them sufficient to dispel any concern. Further, the court considered that

Johnson's motion came four years into his case after many complex issues were resolved and found that he would be disadvantaged because not all firsthand knowledge his counsel possessed could be communicated to new counsel. The court did not abuse its discretion in denying Johnson's 2015 motion to change counsel.

### ii. Johnson's 2016 motion to change counsel

¶188 During the penalty phase, Johnson made an oral motion for change of counsel. Johnson complained that (1) his lawyers were not asking the questions he wanted; (2) his attorneys did not impeach Detective Denning with a statement he believed was impeachment worthy; (3) his lawyers were not objecting to statements Dr. DeMarte assigned to him as Johnson expected they would; and (4) when Johnson requested to waive his presence because his friend was in attendance, his lawyers were overly concerned when told the friend's identity.

¶189 The court responded that Johnson's case was complicated and informed him that his lawyers had to make "difficult decisions on the fly," so "there's always a possibility of miscommunication [and] changes in strategy, depending on how the evidence comes in." However, nothing Johnson told the court persuaded it that the level of communication was diminished enough that the attorney-client relationship was affected. Rather, the court advised Johnson that his counsel was doing a "pretty darn good job, and they're doing their best for you," and denied his motion.

¶190 The court did not abuse its discretion in denying Johnson's 2016 motion to change counsel. Again, the disagreements were minor and related to trial strategy. *See Cromwell*, 211 Ariz. at 186 ¶ 29 (stating that differences in strategy are not an irreconcilable conflict). Though Johnson guessed that he and his counsel had "this communication breakdown between us" and that the relationship was "strained," the record does not suggest the relationship was fractured. After his 2015 motion to change counsel request, but before trial, Johnson filed a request to represent himself in the armed robbery matter, but specifically stated, when asked if he was getting along with his current counsel, "Yeah, yes, I am." Johnson further stated that nothing about his current counsel was bothering him and accepted that his current counsel would remain his advisory counsel for the armed robbery matter, without complaint.

¶191        Based on Johnson's general complaints, the timing of his motion to change counsel, and the lack of evidence indicating the relationship was fractured or that communication was impaired, we hold the court did not abuse its discretion in denying his 2016 motion to change counsel.

### R.  Abuse of Discretion Review

¶192        Arizona law requires that we "review the sentencing portion of the trial even when a defendant fails . . . to challenge the jury's decision with regard to either the aggravating factors or the imposition of the death sentence." *State v. Morris*, 215 Ariz. 324, 340 ¶¶ 75–76 (2007); *see also* A.R.S. § 13-756(A).

#### i.  Aggravating circumstances

¶193        We will uphold the jury's findings of aggravating circumstances "if there is 'any reasonable evidence in the record to sustain it.'" *Morris*, 215 Ariz. at 341 ¶ 77 (quoting *State v. Veatch*, 132 Ariz. 394, 396 (1982)).  As to the (F)(6) aggravator, we have already confirmed that substantial evidence supports it.  *See supra* ¶¶ 26–32.  Evidence also supports the jury's findings of the (F)(2) and (F)(7) aggravators: for the (F)(2) aggravator, that Johnson was previously convicted of a serious offense—the armed robbery—and for the (F)(7) aggravator, that Johnson committed the murder while on probation and release.

#### ii.  Imposition of the death sentence

¶194        We will uphold the jury's death verdict "if any reasonable juror could conclude that the mitigation presented was not sufficiently substantial to call for leniency." *State v. Naranjo*, 234 Ariz. 233, 250 ¶ 89 (2014) (internal quotation marks omitted).

¶195        Johnson presented the following mitigating factors to the jury: (1) Johnson's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was significantly impaired but not so impaired as to constitute a defense to prosecution; (2) Johnson has a genetic predisposition to substance abuse; (3) Johnson has a genetic predisposition to mental health issues; (4) Johnson was adopted as an infant and has been diagnosed as suffering from dissociative disorder

as a result of his adoption, i.e., "adopted-child syndrome"; (5) Johnson was a freshman at Columbine High School at the time of the infamous school shooting and has been diagnosed with PTSD as a result; (6) Johnson was an adolescent when he started abusing substances and has a history of substance abuse; (7) Johnson has a history of mental illness; (8) Johnson's willingness to accept full responsibility for his actions and his willingness to plead guilty to all charges and agree to be sentenced to life in prison without the possibility of parole; (9) Johnson's life has value to his family and friends; and (10) Johnson has the love and support of his family.

¶196    Johnson's mitigation focused mainly on his substance abuse, the Columbine shooting, and his PTSD, but was countered by the State during rebuttal.  Though Johnson argued that Columbine changed and affected him, the State produced evidence showing that Johnson abused drugs and acted recklessly before the Columbine shooting.  The State also presented rebuttal showing the Columbine shooting's impact on Johnson was not as severe as he claimed.  Johnson presented evidence that he was bullied because of his adoption and race, but the evidence also indicated that his family loved and supported him and that his cousins protected him from bullying.  Further, although Johnson presented the testimony of Dr. Kirschner to establish adopted-child syndrome, family members testified that Johnson did not display anger about his adoption or otherwise show that it negatively affected him.  And despite his family's love and support, Johnson's family recognized he was untruthful and dangerous at times.

¶197    Johnson argued that he had a genetic predisposition to substance abuse, but the State showed Johnson's erratic behavior was not limited to drugs: he street-raced cars, passed counterfeit money, and engaged in fights.  To the extent medical experts diagnosed Johnson with PTSD and personality disorder NOS, the State produced evidence indicating that Johnson underreported or misrepresented his behavior. Last, to the extent Johnson claimed remorse, his sincerity was undercut by testimony from Dr. DeMarte that he laughed and was dismissive about the murder.

¶198    Even if Johnson's mitigation evidence were given its full weight, the jurors could reasonably have concluded that it did not call for leniency in light of the brutality and senselessness of the murder along with the other aggravating factors.  The jury did not abuse its discretion when it sentenced Johnson to death.

**S. Excessive Page Limits**

¶199          Though not raised by either party, we must address the excessive lengths of Johnson's briefs. Some cases are more complex than others, and in those cases, flexibility is required. But Johnson's filings stretch that flexibility too far.

¶200          Johnson submitted an original opening brief totaling 105,621 words and covering more than 400 pages, nearly four times our limit, which itself is greatly expanded beyond page limits in civil and non-capital criminal cases. *See* Ariz. R. Crim. P. 31.14(a) (limiting opening briefs to 28,000 words). We struck it but nevertheless granted him 42,000 words to file a revised opening brief. In doing so, we stated:

> In all capital cases, the Court independently reviews the record in its entirety, including all evidence, transcripts, and briefs. For that reason counsel's arguments regarding the need to file a brief far exceeding the extended page limits provided for capital cases are not well-taken, and in any event they should have been raised in advance of the due date to prevent further delay in this case.

¶201          Johnson complied, submitting 41,958 words, but did so by shortening some of his arguments and relegating record citations and legal citations to footnotes without legal analysis. *See* Ariz. R. Crim. P. 31.10(a)(7)(A) (requiring arguments to contain (1) "appellant's contentions with supporting reasons for each contention," along with (2) "citations of legal authorities and appropriate references" to the record). Johnson essentially "evade[d] our page limit by manipulating the format of his brief," of which we disapprove. *Bolton*, 182 Ariz. at 298.

¶202          In response, the State argued that Johnson had waived issues that were not sufficiently developed, specifically issues H, M, O, and P. Johnson then claimed this Court's previous order and imposition of a 42,000-word limit prevented him from fully developing his arguments. In *Bolton*, we rejected that exact argument. *Id.* (noting the "[d]efendant could very well have complied with our rules in the first instance"). There, we "strongly disapprove[d] of defendant's attempt to create legal issues out of

his own failure to cooperate with this [C]ourt in reviewing his case." *Id.* We do so again here.[4]

**¶203** Nevertheless, we granted Johnson 21,000 words in his reply brief, 7,000 more than our traditional limit, *see* Ariz. R. Crim. P. 31.14(a) (limiting reply briefs to 14,000 words), to further develop the arguments that the State claimed were waived. Johnson submitted a 41,853 word reply brief. By Johnson's own recording, 9,072 words were spent supplementing the challenged issues, while 32,781 words were for its regular reply. Its 32,781-word reply alone exceeds our order by over 10,000 words.

**¶204** Johnson argues he could not comply with our word limits because winnowing issues is unethical, citing ABA Guidelines 6.8(a)(5) and comment to Guideline 10.15.1.C, along with *Lockett*, 438 U.S. at 604 (noting the importance of procedural protections to ensure the reliability of sentencing). We reject Johnson's argument. As we stated in *State v. Atwood*:

> Each member of this court is acutely aware of the gravity of the decisions we are called upon to make in capital cases. Therefore, to argue that such deviations from professional appellate practice as occurred in this case are justifiable because the death penalty is at issue is unpersuasive. Rather than aiding our review of defendant's case by judiciously selecting, fully researching, and concisely arguing the colorable issues raised by the trial record, appellate counsel has bombarded this court with a salvo of dubious claims serving little purpose other than to detract from those issues having arguable legal merit.

171 Ariz. 576, 659 (1992).

**¶205** Good advocacy requires winnowing.

> Legal contentions, like the currency, depreciate through over-issue. The mind of an appellate judge is habitually receptive

---

[4] To dispel any concern that Johnson did not have time to edit his briefs to comply with our limits, he requested, and we granted, five extensions. And when we struck his original opening brief in April 2018, we granted him an additional month to edit his brief to comply.

to the suggestion that a lower court committed an error.  But receptiveness declines as the number of assigned errors increases.  Multiplicity hints at lack of confidence in any one. . . .  [E]xperience on the bench convinces [us] that multiplying assignments of error will dilute and weaken a good case and will not save a bad one.

Robert H. Jackson, *Advocacy Before the United States Supreme Court*, 25 Temple L.Q. 115, 119 (1951).

¶206      Similarly, good advocacy requires editing.  It may be that it is "harder to write shorter and crisper," Bryan A. Garner, *Interview with Chief Justice John G. Roberts, Jr.*, 13 Scribes J. Legal Writing 5, 33 (2010) (quoting Chief Justice Roberts), and that writing with "[s]implicity and clarity" requires more "rounds of editing," Bryan A. Garner, *Interview with Justice Clarence Thomas*, 13 Scribes J. Legal Writing 99, 99 (2010) (quoting Justice Thomas), but such is the price of good advocacy.  We do not read the ABA Guidelines to provide otherwise.

¶207      Indeed, in *State v. Amaya-Ruiz*, we were "able to address the 21 arguments submitted by defendant under 11 issues, reflecting our belief that the brief could have withstood further editing without compromising the quality of its arguments."  166 Ariz. 152, 183 (1990) (stating that the court's page limits do not infringe due process rights).  Here, we consolidated twenty-one arguments into seventeen issues, some of which were foreclosed by previous decisions.  And without stating which arguments were overdeveloped (or without merit), we conclude that Johnson could have effectively edited his arguments to fit within the provided word count.  Our conclusion is bolstered by our independent review of the record, finding no reversible error.

¶208      Johnson is entitled to a meaningful opportunity to be heard, but that does not mean that he may decline to comply with this Court's requirements and orders or that he is excused from the obligation to edit his work.

### T.  Issues Preserved for Federal Review

¶209      Johnson identifies thirty-two issues he seeks to preserve for federal review.  As he concedes, we have previously rejected each of his

claims.  We decline to revisit them.

**CONCLUSION**

¶210  For the reasons above, we affirm Johnson's convictions and sentences.